ORIGINAL

1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name    Lewis, Jr.    Milton    J.
            (Last)        (First)        (Initial)

3    Prisoner Number    T48953

4    Institutional Address    Pelican Bay State Prison

5    P.O. Box 7500 Crescent City, CA 95531

6    ==================================================

7                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**

8    Milton Lewis, Jr.

     (Enter the full name of plaintiff in this action.)        CV  08    2338

9
                    vs.                        Case No. _____
10                                              (To be provided by the clerk of court)
     Robert Horel, Warden
11                                              **PETITION FOR A WRIT**  CW
     Pelican Bay State Prison                   **OF HABEAS CORPUS**
12

13

14                                                          **(PR)**
     (Enter the full name of respondent(s) or jailor in this action)
15

16    ==================================================

                    Read Comments Carefully Before Filling In

17    Underline When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19    counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20    San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21    this district if you are challenging the manner in which your sentence is being executed, such as loss of

22    good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24    one of the above-named fifteen counties, your petition will likely be transferred to the United States

25    District Court for the district in which the state court that convicted and sentenced you is located.  If

26    you are challenging the execution of your sentence and you are not in prison in one of these counties,

27    your petition will likely be transferred to the district court for the district that includes the institution

28    where you are confined.  Habeas L.R. 2254-3(b).

1  Who to Name as Respondent

2          You must name the person in whose actual custody you are.  This usually means the Warden or

3  jailor.  Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced.  These are not proper

5  respondents.

6          If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now and the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A.  INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11          1.  What sentence are you challenging in this petition?

12          (a)  Name and location of court that imposed sentence (for example; Alameda

13                County Superior Court, Oakland):

14  Humboldt County Sup. Ct.                    Eureka, CA

15                Court                              Location

16          (b)  Case number, if known ___CR0059975___

17          (c)  Date and terms of sentence ___03/12/03; 22 years, 4 months___

18          (d)  Are you now in custody serving this term?  (Custody means being in jail, on

19                parole or probation, etc.)          Yes __✓__    No _____

20                Where?

21                Name of Institution: __Pelican Bay State Prison__

22                Address: __P.O. Box 7500 Crescent City, CA 95531__

23          2.  For what crime were you given this sentence?  (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known.  If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  Two counts of assault with a semiautomatic firearm (Cal. Pen. Code Sec. 245(b)) with

27  personal firearm use enhancements attending each count (Cal. Pen. Code Sec. 12022.5(a))

28  _____

PET. FOR WRIT OF HAB. CORPUS          - 2 -

3. Did you have any of the following?

    Arraignment:             Yes ✓     No ____

    Preliminary Hearing:      Yes ✓     No ____

    Motion to Suppress:      Yes ____     No ✓

4. How did you plead?

    Guilty ____    Not Guilty ✓    Nolo Contendere ____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

    Jury ✓    Judge alone ____    Judge alone on a transcript ____

6. Did you testify at your trial?        Yes ____     No ✓

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment        Yes ✓     No ____

    (b)    Preliminary hearing    Yes ✓     No ____

    (c)    Time of plea        Yes ✓     No ____

    (d)    Trial             Yes ✓     No ____

    (e)    Sentencing         Yes ✓     No ____

    (f)    Appeal           Yes ✓     No ____

    (g)    Other post-conviction proceeding    Yes ✓     No ____

8. Did you appeal your conviction?      Yes ✓     No ____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal        Yes ✓     No ____

        Year: 2004      Result: Affirmed ____

        Supreme Court of California    Yes ✓     No ____

        Year: 2004      Result: Affirmed ____

        Any other court         Yes ____     No ____

        Year: _____      Result: ____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

1    petition?                                              Yes ✓    No_____

2    (c)    Was there an opinion?                           Yes ✓    No_____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                           Yes _____    No ✓

5    If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?        Yes ✓    No_____

10   [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16   (a)    If you sought relief in any proceeding other than an appeal, answer the following

17          questions for each proceeding. Attach extra paper if you need more space.

18   I.     Name of Court: ___First District Court of Appeal_____

19          Type of Proceeding: ___Petition for writ of habeas corpus_____

20          Grounds raised (Be brief but specific):

21          a.___SEE ADDENDUM_____

22          b._____

23          c._____

24          d._____

25          Result: ___denied w/o prej to filing in sup. ct.___Date of Result:__07/22/04_

26   II.    Name of Court: ___Humboldt County Sup. Ct._____

27          Type of Proceeding: ___Petition for writ of habeas corpus_____

28          Grounds raised (Be brief but specific):

1    a.____SEE ADDENDUM_____

2    b._____

3    c._____

4    d._____

5    Result: __denied_____Date of Result:__09/12/05__

6   III.   Name of Court: __First District Court of Appeal_____

7    Type of Proceeding: ___Petition for writ of habeas corpus_____

8    Grounds raised (Be brief but specific):

9    a.____SEE ADDENDUM_____

10    b._____

11    c._____

12    d._____

13    Result: __denied_____Date of Result:__10/06/05__

14   IV.   Name of Court: __California Supreme Court_____

15    Type of Proceeding: ___Petition for writ of habeas corpus_____

16    Grounds raised (Be brief but specific):

17    a.____SEE ADDENDUM_____

18    b._____

19    c._____

20    d._____

21    Result: __denied_____Date of Result:__07/26/06__

22   NOTE: 9a cont. on next page.
    (b)  Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____   No__✓__

24    Name and location of court: _____

25  B. GROUNDS FOR RELIEF

26    State briefly every reason that you believe you are being confined unlawfully. Give facts to

27  support each claim. For example, what legal right or privilege were you denied? What happened?

28  Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS    - 5 -

9.　　(a) (cont.)

|     |                     |                                    |
| --- | ------------------- | ---------------------------------- |
| V.  | Name of Court:      | Humboldt County Sup. Ct.           |
|     | Type of Proceeding: | Petition for writ of habeas corpus |
|     | Grounds raised:     | SEE ADDENDUM                       |
|     | Result: denied      | Date of Result: 07/13/07           |

|     |                     |                                    |
| --- | ------------------- | ---------------------------------- |
| VI. | Name of Court:      | First District Court of Appeal     |
|     | Type of Proceeding: | Petition for writ of habeas corpus |
|     | Grounds raised:     | SEE ADDENDUM                       |
|     | Result: denied      | Date of Result: 02/21/08           |

|      |                     |                                          |
| ---- | ------------------- | ---------------------------------------- |
| VII. | Name of Court:      | California Supreme Court                  |
|      | Type of Proceeding: | Petition for Review from denial of petition for writ of habeas corpus |
|      | Grounds raised:     | SEE ADDENDUM                             |
|      | Result: denied      | Date of Result: 04/09/08                 |

5.5

1   need more space.  Answer the same questions for each claim.

2        [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3   petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467,  111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5        Claim One:___SEE ADDENDUM_____

6        _____

7        Supporting Facts:_____

8        _____

9        _____

10       _____

11       Claim Two:_____

12       _____

13       Supporting Facts:_____

14       _____

15       _____

16       _____

17       Claim Three:_____

18       _____

19       Supporting Facts:_____

20       _____

21       _____

22       _____

23       If any of these grounds was not previously presented to any other court, state briefly which

24   grounds were not presented and why:

25   All claims raised in the petition were presented to the California courts, including the California

26   Supreme Court.

27   _____

28   _____

1       List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4  SEE ADDENDUM -- MEMORANDUM OF POINTS AND AUTHORITIES

5

6

7  Do you have an attorney for this petition?         Yes_____   No__✓__

8  If you do, give the name and address of your attorney:

9

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on ___April 30, 2005___     _____

14             Date                        Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS       - 7 -

# ADDENDUM TO PETITION FOR WRIT OF HABEAS CORPUS

## ADDENDUM TO PETITION FOR WRIT OF HABEAS CORPUS

A.9.(a) I.  GROUNDS RAISED (See Page 4 of Petition)

    a.    The court's imposition of the aggravated term and enhancement was unauthorized under *Blakely v. Washington* (2004) 542 U.S. 296 and in violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings by proof beyond a reasonable doubt. (Petitioner's case was not yet final when *Blakely* was decided on June 24, 2004.)

A.9.(a) II.  GROUNDS RAISED (See Page 5 of Petition)

    a.    The court's imposition of the aggravated term was unauthorized under *Blakely v. Washington* (2004) 542 U.S. 296 and in violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings by proof beyond a reasonable doubt.

A.9.(a) III.  GROUNDS RAISED (See Page 5 of Petition)

    a.    The court's imposition of the aggravated term and enhancement was unauthorized under *Blakely v. Washington* (2004) 542 U.S. 296 and in violation of the Sixth Amendment, because petitioner was entitled to a jury

1

determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings by proof beyond a reasonable doubt.

A.9.(a) IV.   GROUNDS RAISED (See Page 5 of Petition)

a.   The court's imposition of the aggravated term and enhancement was unauthorized under *Blakely v. Washington* (2004) 542 U.S. 296 and in violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings by proof beyond a reasonable doubt.

A.9.(a) V.   GROUNDS RAISED (See Page 5.5 of Petition)

a.   The court's imposition of the aggravated term and enhancement was unauthorized under *Blakely v. Washington* (2004) 542 U.S. 296 and in violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings by proof beyond a reasonable doubt.

A.9.(a) VI.   GROUNDS RAISED (See Page 5.5 of Petition)

a.   The court's imposition of the aggravated term and enhancement was unauthorized under *Blakely v. Washington* (2004) 542 U.S. 296 and in

violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings by proof beyond a reasonable doubt.

A.9.(a) VII.   GROUNDS RAISED (See Page 5.5 of Petition)

a.   The court's imposition of the aggravated term and enhancement was unauthorized under *Blakely v. Washington* (2004) 542 U.S. 296 and in violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings by proof beyond a reasonable doubt.

B.   GROUNDS FOR RELIEF (See Page 6 of Petition)

Before identifying the specific grounds for relief, petitioner presents the following facts in support of all of his claims:

**Factual Background:**

Except as otherwise noted, petitioner adopts and incorporates by reference the statement of the case and facts as set forth in the opinion of the Court of Appeal of California, First Appellate District, Division Four, filed March 30, 2004.

B.   GROUNDS FOR RELIEF

**Claim One:** Questions and argument by the prosecutor about petitioner's failure to

3

demand a live lineup constituted misconduct by unconstitutionally referring to the exercise of his right to remain silent.

Supporting Facts:

1.    The prosecutor asked Detective Parris, "Now, you are aware, were you not, *that prior to the time of the preliminary hearing, the defendant is entitled to demand a live lineup.?* He replied, "Yes." The prosecutor continued: "Okay. Was any such demand made in this case?" Defense counsel immediately objected that "this unfairly shifts the burden. It is akin, I think, to a *Doyle* error, basically and would move to strike and ask that the jury be admonished that what the defendant says or does is not admissible." (RT 1752)

2.    The court heard further argument outside the presence of the jury and then denied defense counsel's motion. (RT 1756) The prosecutor did not advert to the subject again in his examination of Detective Parris, but near the conclusion of his rebuttal closing argument he said: "We know from Detective Parris, you know, that the defendant has a right to a live lineup. Bring the witnesses in, see them in the flesh. You don't have to – there's some concern about the validity of the identification. You have a right to that. No such lineup was ever requested. Parris didn't put one on because Parris was satisfied with the – with the accuracy of the identifications that he had. No need for it. This – this kind of argument where you're saying that you've got a tainted lineup and all of this is something that could have been cleared up early on and wasn't, that's akin to me – to like the Mendes (sic.) Brothers who killed their parents and then come into court and say: feel sorry for me

4

because I'm – I'm an orphan." (RT 1915)

3.      Despite the prosecutor's contrary implication, the "right" to a lineup is not, unconditional, but is in fact much more restricted, as any prosecutor should know. "We do not hold. . . that in every case where there has not been a pretrial lineup the accused may, on demand compel the People to arrange for one. Rather, as in all due process determinations the resolution here to be made is one which must be arrived at after consideration not only of the benefits to be derived by the accused and the reasonableness of his request but also after considering the burden to be imposed on the prosecution, the police the court and the witnesses." (*Evans v. Superior Court* (1974) 11 Cal. 3d 617, 686; accord, *People v. Williams* (1997) 16 Cal.4th 153, 235)      Thus, the prosecutor's comments were misleading misstatements of the law.

4.      More importantly, the prosecutor's question and comments transformed petitioner's attenuated *right* to request a lineup into an *obligation* to request a lineup, a duty to create the evidence that would either clear him or condemn him.  The prosecutor's unmistakable implication, and the adverse inference he invited the jury to draw, was that a truly innocent man would have asked for a live lineup because a live lineup would have exonerated him.  Thus, the prosecutor in effect asked the jury to use petitioner's silence – his failure to come forward with evidence of his innocence, to "speak up" as it were, before the preliminary hearing – against him.  As such, the sought-for inference suffered from a number

5

of constitutional vices. As defense counsel suggested, it was "akin" to *Doyle* [1] error, the

impeachment of the defendant's testimony with his post-arrest silence after he has been

advised that his silence will not be used against him. It is also – as defense counsel intimated

when he argued the prosecutor's area of inquiry shifted the burden of proof -- akin to *Griffin*[2]

error in that it also violates the *presumption* of innocence that places the entire burden of

producing evidence on the prosecution, and absolves the accused of any burden whatsoever

to come forward with evidence of his innocence. (See e.g., CALJIC No. 2.90; 2.60 ["you

must not draw any inference from the fact that a defendant does not testify"] & 2.61["No lack

of testimony on defendant's part will make up for a failure of proof by the People so as to

support a finding against him. . . ."] The prosecutor's question and comments in argument

constituted misconduct of federal constitutional magnitude.

5.    Courts have consistently found in various contexts that it is prosecutorial

misconduct to comment adversely on the defendant's exercise of constitutional or statutory

rights. Thus, for example, it has been held to be error akin to *Doyle* and *Griffin* error to

permit a prosecutor to use evidence of the defendant's exercise of his Fourth Amendment

right to refuse to police entry in to his home in order to show consciousness of guilt. "'The

right to refuse [entry] protects both the innocent and the guilty, and to use its exercise against

the defendant would be, as the court said in *Griffin*, a penalty imposed by courts for

_____

[1] *Doyle v. Ohio* (1976) 426 U.S. 610.

[2] *Griffin v. California* (1965) 380 U.S. 609.

exercising a constitutional right.'" (*People v. Keener* (1983) 148 Cal. App.3d 73, 79)

6.    Likewise, the prosecutor's comments here, like those in *People v. Conover* (1966) 243 Cal.App. 2d 38 targeted for adverse scrutiny the defendant's failure to assert a right at the preliminary hearing stage of criminal proceedings. In *Conover*, the right at stake was the right to produce witnesses at the preliminary hearing. The *Conover* court held: "[N]o unfavorable inference should be drawn against the accused because he did not by his own evidence raise a conflict as to his guilt. The determination of his guilt was an issue to be tried in superior court. As a consequence, the practice of not offering evidence on behalf of the defendant at a preliminary hearing is well-known and frequently adhered to, of which we are sure the prosecutor must have been well aware. We think the prosecutor's remarks improper." (243 Cal. App.2d at p. 49)

7.    Similarly, in *People v. Lindsey* (1988) 205 Cal.App. 3d 112, the prosecutor in the rebuttal portion of closing argument lambasted defense counsel for letting her supposedly innocent client sit in jail and go through a preliminary hearing instead of informing the District Attorney's Office of appellant's alibi. As here, defense counsel's objection was overruled by the court. The *Lindsey* Court found the prosecutor's argument to be misconduct violative of *Doyle* and reversed Lindsey's conviction. The court considered it immaterial that the prosecutor's comments were aimed at defense counsel rather than the defendant, because "the prosecutor's condemnation of counsel for failing to reveal the alibi defense was tantamount to condemnation of the defendant himself for failing to do so." (205 Cal.App.3d

at p. 117) Here, by commenting on petitioner's failure to assert a right, even a qualified one, to a lineup, the prosecutor was in effect asking the jury to infer that the logical witness he did not call was *himself*. This was misconduct violative of *Griffin* and *Doyle*.

8.    The Court of Appeal in this case found no error, holding: "Questions and arguments about appellant's ability to make such a [live lineup] request permissibly referred to his failure to develop exculpatory evidence" is based on the premise that a live lineup after a photographic lineup would or could clear up any misidentification (i.e., produce exculpatory evidence. (Appendix A at p. 12.)   The problem with this premise is that it is false.

9.    It has been established that information acquired after witnessing an incident may be inadvertently integrated into memory for the event itself.   Once this occurs it is often impossible to separate them out.   Typical sources of such contamination are newspaper reports, comments of other witnesses, and leading questions.   Studies show that a common form of post-event contamination in criminal proceedings occurs when the witness erroneously identifies a defendant on a photo lineup.   With that photograph now clear in the witness's mind, he then identifies the defendant with great certainty and conviction at the preliminary hearing and trial.   As such, the photo lineup itself is actually a form of contaminating post-event information.   (E. F. Loftus, J. Doyle, Eyewitness Testimony, 3d (1997) Lexus Law Publisher, Charlottesville, VA, pp. 54-57, 131, 371; B. Cutler, Eyewitness Testimony (2002), Nat'l Institute for Trial Advocacy, Notre Dame L. S., pp. 42-43; J. Doyle

8

*Two Stories of Eyewitness Error* (Nov. 2003) The Champion, at pp. 24-28.)

10.    Accordingly, the Court of Appeal's **entire** premise that a live lineup after a photo lineup would or could have produced exculpatory evidence (if petitioner had only requested one) is **false**.  It plays upon the misperceptions of jury every bit as much as the prosecutor's closing argument in *People v. Lindsey* (1988) 205 Cal.App. 3d 112, 117, in which he lambasted defense counsel for letting her supposedly innocent client sit in jail and go through a preliminary hearing instead of informing the District Attorney's Office of petitioner's alibi.  Consistent with the reasoning of *Lindsey*, the implication that a post photo lineup would have resolved issue **is unfair simply because it is not true**.

11.    But the problem does not end with the factually erroneous premise that a live lineup after a photo lineup would produce exculpatory evidence.  With this opinion, prosecutors across the state of California will now be permitted to argue a fallacy as gospel truth to the jury at closing argument.   As the argument will have occurred at closing, the defendant will not be afforded the opportunity to correct the matter for the jury.  It will be too late to call an expert witness to testify as to the fallacy.

12.    Courts have recognized that eyewitness identification is not an exact science and is a topic beyond the comprehension of the average juror necessitating the assistance of expert testimony in appropriate cases.  (*People v. McDonald* (1984) 37 Cal.3d 351.)  The United States Supreme Court noted "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification."

9

(*United States v. Wade* (1967) 388 U.S. 218, 228.)  The fact that the accuracy of an eyewitness's identification is dependent upon many factors is now embodied in CALJIC No. 2.92.  Thus, courts have for years recognized that eyewitness identifications are fraught with inaccuracies.  The Court of Appeal's opinion fails to recognize these well-documented difficulties.[3]

13.    The prosecutor's question and comments violated petitioner's due process rights and it cannot be said that the violation was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.)

**Claim Two:**  the trial court erred in permitting the prosecutor to exercise a peremptory challenge against the sole prospective African-American juror solely on the basis of presumed group bias, violating petitioner's constitutional right to equal protection under *Batson v. Kentucky* (1986) 476 U.S. 79.

Supporting Facts:

1.    The prosecutor exercised six peremptory challenges.  With the first of these he excused the sole African American among 55 prospective jurors who were voir dired. (CT 188-201)  In response to the court's general questions to the venire, Ms. G. volunteered she had a "brother who didn't meet his probation officer on numerous occasions," and "had a cousin that was convicted of a charge." (RT 102)  She did not know what her brother's

---

[3]    This is no small matter.  Of the first 100 wrongful convictions proven by DNA technology, over 80 percent relied to an important extent on sincere, confident, mistaken eyewitnesses.  (J. Dwyer, B. Scheck and P. Neufeld, *Actual Innocence* (2000).

charges were, and was not asked by the court about her cousin's conviction. Both cases occurred in counties other than Humboldt. She said she could be fair. (RT 102-103) She said she wasn't sure it counted as law enforcement experience, but she had gone through law enforcement training with the forest service four years earlier "to write citations and whatever." She wasn't really "enforcing," just patrolling. She was also a ticket dispatcher and writer for the College of the Redwoods. (RT 108-109) Again, this experience would not affect her ability to be fair. (*Id.*) She had lived in the area for seven years, and had moved from Arcata to Eureka two weeks earlier. She was single and childless. She graduated from HSU. She had worked for the Forest Service as a file Tech and a forest Tech for about 10 years, but she had been a direct care worker for two and a half years. (RT 128)

2.    In response to defense counsel's questions she elaborated that she currently worked at a care home, and that she had done seasonal, on and off work for the Forest Service. (RT 149) She said she could be fair. (RT 150)    In response to the prosecutor's questions she said she had majored in forestry in college, and that as a direct care worker she worked in one of two homes, wherever she could find work.    Asked what her law enforcement training by the forest service consisted of, she said "it was law enforcement level one and I guess that is really just the basics, like, um, how to maintain your appearance, your stance, just basic stuff, who in the – like subordinate, who in the hierarchy, who would you call on if the situation would rise to something out of my hands, who would I call on and everything." (RT 195) Asked if she had "ever ha[d] any sort of situation where there was a

11

confrontation with somebody because of your position in the forest service," she answered yes. Asked if any charges had been brought against anyone as a result, she said no, it had been resolved. (RT 196) In response to his question about her campus security job at CR, she reiterated she had been a citation writer. (RT 196) He did not ask about her ability to be fair. He did not ask about the nature of her cousin's out of county conviction.

3.    As noted, the prosecutor's first peremptory challenge was against Ms. G. (RT 387) Defense counsel immediately made a *Wheeler*[4] motion. (RT 388) Defense counsel stated, and all agreed, she was the only black person on the panel. (RT 388-389). Defense counsel continued: "She expressed no reservations about her ability to be fair. She's got experience, family related experience with the criminal justice system. She's worked in a, sounds like, a quasi law enforcement capacity and had some basic law enforcement training. She's well educated. And I can think of no reason why a peremptory challenge ought to be granted."

4.    The prosecutor responded that he understood he was required to explain his reasons for exercising the challenge once the court finds a *prima facie* showing that challenge was exercised "solely because – for, partially, I guess, because the individual belonged to a particular group." (RT 389) The prosecutor did not address himself to the question of whether a *prima facie* case had been shown but rather gave a plethora of reasons justifying his use of a peremptory challenge against Ms. G, including that G.'s brother and cousin had

---

4

*People v. Wheeler* (1978) 22 Cal.3d 258.

been convicted of crimes, and "found [it] highly unusual" that she was unaware of the charges against the brother.  He admitted that the potential jurors were not "excited about the voir dire process," but noticed that G. had her arms crossed before any questions were asked and "appeared to be especially bored."  He saw that G. sat apart from the rest of the jurors during a break; that behavior and the confrontation she reported having at the Forest Service made him worried that she would not get along with the other jurors.  He found G.'s claim to law enforcement training "somewhat self-inflating," and suspected that she had been fired from the Forest Service because she no longer worked there despite having a forestry degree.  He thought that defense counsel had a rapport with G. and that she was "overly impressed" with defense counsel; he worried that he might "have offended [G.] in some fashion."  (RT 388-398.)

5.    Defense counsel replied that he had not observed anything suggesting that Ms. G. would be unfit to serve on the jury.  Counsel thought much of what the prosecutor said was "sheer speculation"; Ms. G., for example, might have left the Forest Service voluntarily and not been fired.  Counsel submitted that Ms. G. was attentive, honest, and articulate in voir dire.

6.    The court ruled that the defense had not made a prima facie case that S. G. was excused because of her race, and that the prosecutor had in any event given valid neutral reasons for the challenge.

7.    The trial court erred in concluding that petitioner had not made a *prima facie*

13

showing of race-based discrimination in the district attorney's peremptory challenge of Ms. G., the sole African American juror in the entire jury venire, and in ruling that the district attorney's reasons for exercising the challenge were, in any event, race-neutral.

8.     Under federal law, the use of peremptory challenges to strike prospective jurors solely on the basis of presumed group biases violates the defendant's, as well as the prospective juror's, constitutional right to equal protection of the laws. (*Batson v. Kentucky* (1986) 476 U.S. 79.)

9.     The *Batson* inquiry requires a three step analysis. "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." (*Purkett v. Elem* (1995) 514 U.S. 765, 767; *Miller-el v. Cockrell* (2003) 537 U.S. ____;123 S.Ct. 1029, 1040)

10.     The Court of Appeal in this case, found no error, holding, "On the foregoing record, even assuming that a prima facie case of discrimination had been established, the prosecution met the burden of showing that the challenge was not predicated on group bias." (Appendix A at p. 21.)

> S.G.'s family member's negative experiences with law enforcement were a well-recognized valid ground for the peremptory challenge. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1123-1124; *People v. Turner* [(1994) 8 Cal.4th [137,] 171.) The prosecutor also made various observations and

judgments of S. G.— she was not forthcoming about the charges against her brother, she was bored by the proceedings, aloof from other jurors, and enamored of defense counsel—that constituted reasonable, race-neutral grounds for challenging her. (*People v. Reynoso* (2003) 31 Cal.4th 903, 917 [well settled that challenge may be based on counsel's personal observations].)

Accordingly, the court did not err in denying the *Wheeler* motion.

(Appendix A at pp. 21-22.)

In so holding, the Court of Appeal refused to permit a comparative analysis of jurors who also had negative experiences with law enforcement but were not challenged. This also was erroneous. In *Miller-El v. Dretke* (2005) 545 U.S. 231, 239-252, the United States Supreme Court performed a comparative juror analysis, in which the court reviewed the transcripts from voir dire and compared the juror questionnaires of the challenged and seated jurors. In *Boyd v. Newland* (9th Cir. 2006) 467 F.3d 1139, the Ninth Circuit reversed a California case, holding that without entire voir dire transcript, California appellate courts could not have evaluated relevant circumstances surrounding peremptory strike of an African-American juror, as required by *Batson*. (*Id.,* at pp. 144-1145.) *Boyd* concluded, "Because we hold that, under the clearly established Supreme Court precedent of *Batson*, comparative juror analysis is an important tool that courts should utilize on appeal when assessing a defendant's plausible *Batson* claim, we also must conclude that all defendants, including those who are indigent, have a right to have access to the tools which would enable them to develop their plausible *Batson* claims through comparative juror analysis." (*Id.,* at p. 1150.)

15

The excluded juror, who was the only African-American prospective juror—in a county where African-American citizens were described by the prosecutor as "a significant minority," but where petitioner, the victims and all the non-law enforcement, percipient witnesses were African American—was the subject of the prosecutor's very first peremptory challenge. As a result, there was no comparative juror evidence to place before the trial court. Thus, in evaluating the establishment of a *prima facie* case of purposeful discrimination, or the *bona fides* of the prosecutor's volunteered explanations, the trial court did not have the full picture before it. A comparative juror analysis should be permitted in order to permit petition to show "that a finding of pretext was warranted." (*Lewis v. Lewis* (2003) 321 F.3d 824, 832.)

**Claim Three:** In violation of the Sixth and Fourteenth Amendments to the United States Constitution and *Blakely v. Washington* and *Cunningham v. California*, the trial court illegally imposed the aggravated term in petitioner's case.

Supporting Facts:

A.    Introduction

1.    Before the California Supreme Court denied petitioner's petition for review, on June 24, 2004, the United States Supreme Court held in *Blakely v. Washington* that where state law establishes a presumptive sentence for a particular offense and authorizes a greater term only if certain additional facts are found (beyond those inherent in the plea or jury verdict), the Sixth Amendment entitles the defendant to jury determination of those

additional facts by proof beyond a reasonable doubt. (*Blakely v. Washington* (2004) 542 U.S. 296, 301-302.) On July 15, 2004, petitioner filed a writ of habeas corpus in the Court of Appeal, contending that the trial court unlawfully imposed the aggravated terms in petitioner's case under *Blakely*. On July 22, 2004, the Court of Appeal denied petitioner's writ of habeas corpus "without prejudice to the filing of the petition in Humboldt County Superior Court" (A107093).

2.     On July 28, 2004, petitioner filed a writ raising the identical claim in Humboldt County Superior Court. On August 6, 2004, Humboldt County Superior Court issued an Order to Show Cause. On September 12, 2005, Humboldt County Superior Court denied the writ based on the California Supreme Court's decision in *People v. Black* (2005) 35 Cal.4th 1238 (*Black I*), which had concluded that *Blakely* did not apply to sentencing in California.

3.     On October 5, 2005, petitioner filed a writ in the Court of Appeal, raising the identical claim for exhaustion purposes; on October 6, 2005, the writ was denied (A111580), citing *People v. Black I, supra,* 35 Cal.4th 1238. Petitioner renewed the writ raising the identical claim again in the California Supreme Court on October 17, 2005; the writ was denied on July 26, 2006.

4.     On January 31, 2007, Attorney Richard Braucher filed a new writ petition, on petitioner's behalf, in Humboldt County Superior Court, raising the identical *Blakely* claim, in light of *Cunningham v. California* (2007) 549 U.S. ___, 127 S.Ct. 856, which had

17

overruled *Black I*.  On February 22, 2007, Humboldt County Superior Court issued an OSC. Humboldt County Deputy Public Defender Jonathan McCrone was appointed to represent petitioner at the OSC proceeding.  On July 13, 2007, Humboldt County Superior Court denied the writ solely on grounds that "Cunningham does not apply retroactively to petitioner's case that is already final."

      B.      <u>No Retroactivity Problems Attend Petitioner's Case Because it Was Not Yet Final at the Time *Blakely v. Washington* (2004) 542 U.S. 296 was Decided</u>

      5.      We assert that no retroactivity problems attend petitioner's case because it was not yet final at the time *Blakely* was decided.  Accordingly, the superior court's holding that "Cunningham does not apply retroactively to petitioner's case that is already final" was incorrect.

      6.      *Cunningham* stated that its holding arose out of *Apprendi* and *Blakely*, stating that California's DSL violated *Apprendi*'s "bright line rule." (*Cunningham,* at p. 869.) Accordingly, *Cunningham* does not announce a "new rule of law" withing the meaning of *Teague v. Lane* (1989) 489 U.S. 288, but instead is an application of those precedents. Since petitioner's petition for review was pending when *Blakely v. Washington* (2004) 542 U.S. 296 was decided on June 24, 2004, petitioner's claims based on *Blakely* are cognizable and reviewable. *Cunningham* is nothing more than an express reaffirmation of the legal principals which were clearly set forth in *Blakely* for the sole purpose of invalidating the decision of this Court in *Black I*. Put another way, there are no retroactivity problems as to *Cunningham* because *Cunningham* merely held what petitioner has argued all along: that *Blakely* applies

Case 4:08-cv-02337-CW Document 1 Filed 05/06/2008 Page 28 of 75

to California's Determinate Sentence Law (DSL).

7.     *Cunningham* held that the decision in *People v. Black, supra,* 35 Cal.4th 1238, ruling that *Blakely* did not apply to the DSL, was wrong.[5] *Cunningham* held that because a DSL upper term requires findings of additional aggravating circumstances beyond the minimum elements of the offense, "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum" under *Apprendi v. New Jersey* (2000) 530 U. S. 466 and *Blakely v. Washington, supra,* 542 U.S. 296. (*Cunningham, supra,* 127 S.Ct. at p. 868.) "Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt [citation], the DSL violates *Apprendi*'s bright-line rule." (*Ibid.*) "Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent. [Fn.]" (*Id.,* at p. 871.)

8.     As *Cunningham* merely reaffirmed of the legal principals of *Blakely,* which petitioner has argued all along apply to this case, there are no procedural impediments which would preclude application of *Cunningham* to petitioner's case.

_____

[5]     "Contrary to the *Black* court's holding, our decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum. Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (*Cunningham,* at p. 871.)

C.   As Confirmed by *Cunningham*, the Court's Imposition of the Aggravated Term Was Unauthorized under *Blakely* and in Violation of the Sixth Amendment, Because Petitioner Was Entitled to a Jury Determination of Those Additional Facts Exposing Him to the Possibility of a Sentence Greater than the Maximum Allowed by a Jury's Findings (In California: the Middle Term) by Proof Beyond a Reasonable Doubt

9.    In this case, a jury found petitioner guilty of two counts of assault with a semiautomatic firearm (Pen. Code, § 245(b)) against David Moore (count I) and against Keenin Ephraim, Delvin Hudson and Cameron Matthews (count II), and found true two personal use of a firearm (§ 12022.5 (a)) enhancement allegations attending each count. (CT 312-315.)

10.    At sentencing, the court denied probation, and sentenced petitioner to the maximum term allowed by law: 22 years, four months in state prison (CT 333), calculated as follows: the aggravated term of 9 years on the assault with a semiautomatic firearm (§ 245(b)) against Keenin Ephraim, Delvin Hudson and Cameron Matthews (count II), designated as the principal term, plus an aggravated 10-year term for the personal firearm use enhancement (§ 12022.5 (a)) to be served consecutive with count II. As to the balance of the counts, the court ordered consecutive (§ 1170.1 one-third the midterm) sentences of two years for the assault with a semiautomatic firearm (§ 245(b)) violation in count I and 16 months for the personal firearm use enhancement (§ 12022.5 (a)) attending that count. (EXHIBIT A: RT 1989-1995; 2004.)

11.    In choosing the aggravated term, the court stated:

Start with Count Two. The violation of Penal Code Section 245,

20

subdivision (B), involving the shooting at victims Hudson, Effrium [sic] and Mathews [sic], which would be designated as the principal term, it is the Court's decision to impose the upper term of nine years for the following reasons: I have considered the circumstances in aggravation set forth in Rule 4.421, and the circumstances in mitigation set forth in Rule 4.423.

Under Rule 4.421, the Court has considered and finds the following aggravating facts as they relate to Count Two: Under 4.421(a)(1), the crime involved great violence and the threat of great bodily harm. It involved shooting at a public parking lot [sic] at three victims. There were many other people present, as well.

Under 4.421(b)(4), the defendant was on probation, conditional revokable release on four separate misdemeanor cases at the time of this offense.

Under 4.421(b)(5), his performance on probation has not been satisfactory, and he has suffered prior violations and—in one of the cases, and clearly his juvenile probation performance was not satisfactory.

As to Count Two, the Court also considered as other aggravating circumstances as permitted under Rule 4.408, the defendant has accepted no responsibility for his actions. He fled the county. Initially has not ever expressed any remorse, or in any way acknowledged any wrongdoing, or accepted any responsibility for his conduct. Nothing in the probation report indicates otherwise. His letter to the Court does not indicate otherwise. And none of the evidence presented during the trial show anything differently.

(EXHIBIT A: RT 1990-1991.)

12.    As discussed below, as confirmed by *Cunningham*, the court's imposition of

the aggravated term was unauthorized under *Blakely* and in violation of the Sixth

Amendment, because petitioner was entitled to a jury determination of those additional facts

exposing him to the possibility of a sentence greater than the maximum allowed by a jury's

findings (in California: the middle term) by proof beyond a reasonable doubt.

21

13.    In *Cunningham*, the defendant was tried and convicted of continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a)), punishable by imprisonment for a lower term sentence of 6 years, a middle term sentence of 12 years, or an upper term sentence of 16 years.   At sentencing, the trial judge found by a preponderance of the evidence six aggravating circumstances, among them, the particular vulnerability of the victim, and the defendant's violent conduct, which indicated a serious danger to the community.   The judge found one mitigating fact, i.e., that the defendant had no criminal record.   The court then concluded that the aggravating factors outweighed the mitigating factor, and imposed the upper term of 16 years.   (*Cunningham v. California, supra,* 127 S.Ct. at p. 860-861.) *Cunningham*'s sentence was affirmed, citing *Black I*, which had concluded that *Blakely* did not apply to the DSL in California.

14.    The United States Supreme Court held that this was error under *Apprendi v. New Jersey* (2000) 530 U. S. 466, 490,

> Under California's DSL, an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance. See *supra,* at --- - ----4-5. An element of the charged offense, essential to a jury's determination of guilt, or admitted in a defendant's guilty plea, does not qualify as such a circumstance. See *supra,* at --- - ----5-6. Instead, aggravating circumstances depend on facts found discretely and solely by the judge. In accord with *Blakely,* therefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum. 542 U.S., at 303, 124 S.Ct. 2531 ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" (emphasis in original)). Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, see *supra,* at ----5, the DSL violates *Apprendi's* bright-line rule: Except for a prior

22

conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S., at 490, 120 S.Ct. 2348.

(*Cunningham,* at p. 868.)

15.    As for the decision in *Black, Cunningham* summarized, "Contrary to the *Black* court's holding, our decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum. Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (*Cunningham,* at p. 871.) *Cunningham* reversed, concluding: "As to the adjustment of California's sentencing system in light of our decision, '[t]he ball ... lies in [California's] court.'" (*Ibid.*) *Cunningham* applies to petitioner's case and requires the same result.

16.    It is beyond dispute that the trial court's finding, "Under 4.421(a)(1), the crime involved great violence and the threat of great bodily harm" (EXHIBIT A: RT 1990) falls squarely within *Cunningham*'s prohibition on judicial findings of current-offense aggravating factors. Its comments that the offense "involved shooting at a public parking lot [sic] at three victims" and that "[t]here were many other people present, as well" are precisely the kind of judicial findings of historical facts of the offense proscribed by *Cunningham*. The same is true of the trial court's findings that, under rule 4.408, petitioner "has not ever expressed any remorse, or in any way acknowledged any wrongdoing, or accepted any responsibility for his conduct." (EXHIBIT A: RT 1990-1991.)   These findings plainly violate *Cunningham*.

23

17.    The two remaining stated aggravating factor findings—that "[u]nder 4.421(b)(4), the defendant was on probation, conditional revokable release on four separate misdemeanor cases at the time of this offense" and "Under 4.421(b)(5), his performance on probation has not been satisfactory, and he has suffered prior violations and—in one of the cases, and clearly his juvenile probation performance was not satisfactory (EXHIBIT A: RT 1990)—also contravene *Cunningham*.

18.    As all of the foregoing comments constitute judge-made findings used to impose an upper term beyond those determined by the jury's verdicts, they come within *Cunningham*'s prohibition. None of these constitute judicial recognition of the mere fact of a prior conviction. (See *Almendarez-Torres v. United States* (1998) 523 U.S. 224.)

19.    Here, the trial court's finding under rule 4.421(b)(5) that petitioner's performance on probation was unsatisfactory (EXHIBIT A: RT 1990) clearly manifests an inherently factual inquiry that goes beyond judicial recognition of the mere fact of conviction, because it consists of an evaluation or assessment of facts about which a jury might come to an altogether different conclusion. The same is true of the court's comment that under 4.421(b)(4) petitioner was on probation at the time of this offense. The findings are prohibited by *Cunningham*.

20.    For these reasons, petitioner had a federal constitutional right to a jury trial on the facts underlying the aggravating factors used to impose the upper term in this case.

21.    *Blakely* error is reviewed under the harmless error standard set forth in

24

*Chapman v. California* (1967) 386 U.S. 18, as applied in *Neder v. United States* (1999) 527

U.S. 1. (*People v. Sandoval* (2007) 41 Cal.4th 825, 838, *Washington v. Recuenco* (2006) 548

U.S. 212.) In making this determination, a reviewing court "must determine whether, if the

question of the existence of an aggravating circumstance or circumstances had been

submitted to the jury, the jury's verdict would have authorized the upper term sentence."

(*People v. Sandoval, supra,* at p. 838.)

22.    Here, imposition of the aggravated term, in general, was hotly contested.

(EXHIBIT A: RT 1995-1998.) The court's findings were not supported by overwhelming

evidence. Harmless error analysis, therefore, does not withstand *Neder* scrutiny. (*Neder,* 527

U.S. at p. 18-19.) *Cunningham* error here was not harmless beyond a reasonable doubt.

Accordingly, even under *Chapman,* the error nevertheless requires reversal.

**Claim Four:** in violation of the Sixth Amendment to the United States Constitution

and *Blakely v. Washington,* the trial court illegally imposed the aggravated term for the

enhancement in petitioner's case

Supporting Facts:

1.    The court's imposition of the aggravated term of 10 years for the personal use

of a firearm (§ 12022.5 (a)) enhancement allegation relating to count II was also

unauthorized under *Blakely* and in violation of the Sixth Amendment, because petitioner was

entitled to a jury determination of those additional facts exposing him to the possibility of a

sentence greater than the maximum allowed by a jury's findings (in California: the middle

term) by proof beyond a reasonable doubt. In imposing the aggravated term for the personal

use of a firearm (§ 12022.5 (a)) enhancement allegation relating to count II, the court gave

these reasons:

> In aggravation was to the enhancement, again related to Count Two, the Court finds the following: Under Rule 4.421(b)(1), the defendant has a history of engaging in violent conduct, indicating a serious danger to others. Even given his age, he has in the past engaged in serious violence on numerous occasions. His juvenile record includes numerous incidents involving fighting, weapons, threatening others, being found in possession of a loaded .22 semiautomatic pistol, and also suffered a conviction of 246, discharging a firearm at an occupied motor vehicle. On that he was committed to the Youth Authority. Clearly, the incident that occurred in this particular case before the Court is not an isolated incident of violence, or violent conduct apparently, was not new to Mr. Lewis.

> Under 4.421(b)(2), the defendant's prior convictions as an adult and sustained petitions in juvenile court, are of numerous and increasing seriousness. In 1992, the defendant, as a minor, admitted offenses of fighting, 415. After that he had a 242, a battery involving he and another minor with a chain. In 1994, we have a 12101(a) having to do with possession of a loaded pistol. '95, there is [sic] also other additional numerous charges including the Penal Code Section 246, having to do with the shooting at an occupied vehicle. The conviction resulted in a commitment to the Youth Authority.

> As an adult, he's suffered four misdemeanor convictions already, including Vehicle Code Section 2800.2. He has a lengthy history and is of increasing seriousness [sic].

> Under Rule 4.421(b)(3), it is an aggravating factor, the defendant has served time in the California Youth Authority.

(EXHIBIT A: RT 1991-1992.)

2.      The court's imposition of the aggravated term was unauthorized under *Blakely*

and in violation of the Sixth Amendment, because petitioner was entitled to a jury

determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings (in California: the middle term) by proof beyond a reasonable doubt.

3.     The court's findings under rule 4.421(b)(1), (2), and (3) all involve factual inquiries, exceeding judicial recognition of the mere fact of conviction, in that they all consist of evaluation or assessment of facts about which a jury might come to an altogether different conclusion. To the extent the trial court's exercise of discretion is influenced by the facts of the case, as they are here, judicial factfinding proscribed by *Blakely* enters the sentencing process.

4.     Even if the court's final finding (that petitioner served a term in CYA under rule 4.421(b)(3)) is considered a fact of a prior conviction (which petitioner does not concede), the lion's share of the judicial findings strictly forbidden by *Blakely*. Allegations of prior juvenile adjudications to enhance a sentence come within *Apprendi*'s "prior conviction" exception, because, unlike in adult cases, juveniles do not have the right to jury trial. (*United States v. Tighe* (9th Cir. 2001) 266 F.3d 1187, 1194 ["Juvenile adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-doubt burden of proof, therefore, do not fall within Apprendi's 'prior conviction' exception"].)     For the reasons already discussed in the preceding argument, as imposition of the aggravated term, in general, was vigorously contested (EXHIBIT A: RT 1995-1998) and the court's findings were not supported by overwhelming evidence, harmless error analysis does not survive

*Neder* scrutiny.  (*Neder,* 527 U.S. at p. 18-19.)  Accordingly, even under *Chapman*, the *Blakely* error requires reversal.

# POINTS AND AUTHORITIES IN SUPPORT OF
# PETITION FOR WRIT OF HABEAS CORPUS

1    Milton J. Lewis, T48953
     Pelican Bay State Prison
2    P.O. Box 7500
     Crescent City, CA 95531
3
     Petitioner, pro se
4
5                 IN THE UNITED STATES DISTRICT COURT

                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
6
7
     **MILTON LEWIS, JR.,**                    )
8                                              )    No. _____
                                               )
9                  Petitioner,                 )
                                               )
10           v.                                )
                                               )
11   **ROBERT HOREL,** Warden,                 )
     Pelican Bay State Prison,                 )
12                                             )
                   Respondent.                 )
13   _____ )
14
15        **POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR
              WRIT OF HABEAS CORPUS, 28 U.S.C. § 2254**
16
          Petitioner, MILTON LEWIS, JR., hereby files these points and
17
     authorities in support of his petition for writ of habeas corpus, file pursuant
18
     to 28 U.S.C. § 2254, *et seq.*
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Trial and Direct Appellate Proceedings . . . . . . . . . . . . . . . . . . . . . . 2

    Habeas Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    THE PROSECUTOR COMMITTED PREJUDICIAL
    MISCONDUCT BY ELICITING TESTIMONY THAT
    PETITIONER HAD A "RIGHT" TO A PRE-PRELIMINARY
    HEARING LINEUP AND ARGUING TO THE JURY THAT IT
    COULD DRAW A NEGATIVE INFERENCE FROM HIS
    FAILURE TO AVAIL HIMSELF OF THAT RIGHT . . . . . . . . . . 5

    A.    Introduction and Background . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    As the Prosecutor's Questioning and Argument about His
        Failure to Demand a Lineup, in Effect, Asked the Jury to Use
        Petitioner's Silence Against Him and Improperly Shifted the
        Burden of Proof, it Was Akin to Error under *Doyle v. Ohio*
        (1976) 426 U.S. 610 and *Griffin v. California* (1965) 380 U.S.
        609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.    As the Court of Appeal's Entire Premise That a Live Lineup
        after a Photo Lineup Could Have Produced Exculpatory
        Evidence Is False, it Unfairly Plays upon the Misperceptions
        of Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.   THE TRIAL COURT ERRED IN PERMITTING THE
    PROSECUTOR TO EXERCISE A PEREMPTORY CHALLENGE
    AGAINST THE SOLE PROSPECTIVE AFRICAN-AMERICAN
    JUROR SOLELY ON THE BASIS OF PRESUMED GROUP
    BIAS, VIOLATING PETITIONER'S CONSTITUTIONAL
    RIGHT TO EQUAL PROTECTION UNDER *BATSON V.*
    *KENTUCKY* (1986) 476 U.S. 79 . . . . . . . . . . . . . . . . . . . . . . 12

    A.    Introduction and Background . . . . . . . . . . . . . . . . . . . . . . 12

    B.    *Batson* Principles and Analysis . . . . . . . . . . . . . . . . . . . . . 15

III.  IN VIOLATION OF THE SIXTH AND FOURTEENTH
    AMENDMENTS TO THE UNITED STATES CONSTITUTION
    AND *BLAKELY V. WASHINGTON* AND *CUNNINGHAM V.*
    *CALIFORNIA*, THE TRIAL COURT ILLEGALLY IMPOSED THE
    AGGRAVATED TERM IN PETITIONER'S CASE . . . . . . . . . . 18

    A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B.  No Retroactivity Problems Attend Petitioner's Case Because it Was Not Yet Final at the Time *Blakely v. Washington* (2004) 542 U.S. 296 was Decided . . . . . . . . . . . . . . . . . . 19

C.  As Confirmed by *Cunningham*, the Court's Imposition of the Aggravated Term Was Unauthorized under *Blakely* and in Violation of the Sixth Amendment, Because Petitioner Was Entitled to a Jury Determination of Those Additional Facts Exposing Him to the Possibility of a Sentence Greater than the Maximum Allowed by a Jury's Findings (In California: the Middle Term) by Proof Beyond a Reasonable Doubt . . 21

IV.  IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND *BLAKELY V. WASHINGTON*, THE TRIAL COURT ILLEGALLY IMPOSED THE AGGRAVATED TERM FOR THE ENHANCEMENT IN PETITIONER'S CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Almendarez-Torres v. United States* (1998)
523 U.S. 224 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Apprendi v. New Jersey* (2000)
530 U.S. 466 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

*Batson v. Kentucky* (1986)
476 U.S. 79 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15

*Blakely v. Washington* (2004)
542 U.S. 296 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18-20

*Boyd v. Newland* (9th Cir. 2006)
467 F.3d 1139 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Chapman v. California* (1967)
386 U.S. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25

*Cunningham v. California* (2007)
549 U.S. ___, 127 S.Ct. 856 . . . . . . . . . . . . . . . . . . . 3, 18-20, 23

*Doyle v. Ohio* (1976)
426 U.S. 610 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Griffin v. California* (1965)
380 U.S. 609 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Lewis v. Lewis* (2003)
321 F.3d 824 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Miller-el v. Cockrell* (2003)
537 U.S. _____ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Miller-El v. Dretke* (2005)
545 U.S. 231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Neder v. United States* (1999)
527 U.S. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 28

*Purkett v. Elem* (1995)
514 U.S. 765 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Teague v. Lane* (1989)
489 U.S. 288 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Tighe* (9th Cir. 2001)
266 F.3d 1187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Wade* (1967)
388 U.S. 218 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Washington v. Recuenco* (2006)
    548 U.S. 212 . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## STATE CASES

*Evans v. Superior Court* (1974)
    11 Cal.3d 617 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*In re Crockett* (2008)
    159 Cal.App.4th 751 . . . . . . . . . . . . . . . . . . . . . . . 3

*People v. Black* (2005)
    35 Cal.4th 1238 . . . . . . . . . . . . . . . . . . . . . . . 3, 18, 20

*People v. Conover* (1966)
    243 Cal.App.2d 38 . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*People v. Gutierrez* (2002)
    28 Cal.4th 1083 . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Keener* (1983)
    148 Cal.App.3d 73 . . . . . . . . . . . . . . . . . . . . . . . . . 7

*People v. Lindsey* (1988)
    205 Cal.App.3d 112 . . . . . . . . . . . . . . . . . . . . . . 8, 10

*People v. McDonald* (1984)
    37 Cal.3d 351 . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*People v. Reynoso* (2003)
    31 Cal.4th 903 . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Sandoval* (2007)
    41 Cal.4th 825 . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*People v. Turner* (1994)
    8 Cal.4th 137 . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*People v. Wheeler* (1978)
    22 Cal.3d 258 . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. Williams* (1997)
    16 Cal.4th 153 . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## FEDERAL STATUTES

**United States Code**

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 29

**United States Constitution**

Amendment IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Amendment VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20-23, 26, 27

Amendment XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

### STATE STATUTES

**California Rules of Court**

Rule 4.408 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

Rule 4.421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24-27

Rule 4.423 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**California Jury Instructions, Criminal**

CALJIC 2.60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CALJIC 2.61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CALJIC No. 2.90 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CALJIC No. 2.92 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**California Penal Code**

§ 242 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

§ 245 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21

§ 246 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

§ 288.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

§ 415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

§ 1170.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

§ 12022.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21, 26

§ 12101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Vehicle Code**

§ 2800.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

### OTHER AUTHORITIES

B. Cutler, Eyewitness Testimony (2002), Nat'l Institute for Trial
Advocacy, Notre Dame L. S., pp. 42-43 . . . . . . . . . . . . . . . . . . . . . . . 9

J. Doyle *Two Stories of Eyewitness Error* (Nov. 2003) The Champion, at pp. 24-28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

J. Dwyer, B. Scheck and P. Neufeld, *Actual Innocence* (2000) . . . . . . . 11

E. F. Loftus, J. Doyle, Eyewitness Testimony, 3d (1997) Lexus Law Publisher, Charlottesville, VA, pp. 54-57, 131, 371 . . . . . . . . . . . . . . . . . 9

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

**MILTON LEWIS, JR.,**

                Petitioner,

    v.

**ROBERT HOREL,** Warden,
Pelican Bay State Prison,

              Respondent.

No. _____

## POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS, 28 U.S.C. § 2254

    Petitioner, MILTON LEWIS, JR., hereby files these points and authorities in support of his petition for writ of habeas corpus, file pursuant to 28 U.S.C. § 2254, *et seq.*

## STATEMENT OF THE CASE

**Trial and Direct Appellate Proceedings**

    A Humboldt County jury tried petitioner for two counts of assault with a semiautomatic firearm (Pen. Code[1], § 245(b)) against David Moore (count I) and against Keenin Ephraim, Delvin Hudson and Cameron Matthews (count II); two personal use of a firearm (§ 12022.5 (a)) enhancement allegations attended each count.  (CT [2] 155-156.)  On

---

[1]

    All references to "Pen. Code" or "Penal Code" are to the California Penal Code.

[2]

    "CT" refers to the Clerk's Transcript, and "RT" refers to the Reporter's Transcript in petitioner's appeal, *People v. Milton Lewis, Jr.*, Case No. A098387.

1    February 8, 2002, the jury returned verdicts of guilty on both counts and

2    found both firearm use allegations true. (CT 312-315.)

3        On March 12, 2002, the Court sentenced petitioner to the maximum

4    aggravated term allowed by law: 22 years, four months in state prison. (CT

5    333.) After filing a timely notice of appeal (CT 337), in a published

6    opinion filed March 30, 2004, the First District Court of Appeal for the

7    State of California affirmed petitioner's judgment of conviction and

8    sentence in *People v. Milton Lewis, Jr.*, Case No. A098387.[3]  The

9    California Supreme Court denied a petition for review on June 30, 2004.[4]

10   **Habeas Proceedings**

11       On July 15, 2004, petitioner filed a writ of habeas corpus in the First

12   District Court of Appeal,  contending that the trial court unlawfully imposed

13   the aggravated terms in petitioner's case under *Blakely v. Washington*

14   (2004) 542 U.S. 296. (Petitioner's case was not yet final when *Blakely* was

15   decided on June 24, 2004.) On July 22, 2004, the First District Court of

16   Appeal denied petitioner's writ of habeas corpus "without prejudice to the

17   filing of the petition in Humboldt County Superior Court" (A107093).

18   (EXHIBIT B[5].)

19       On July 28, 2004, petitioner filed a writ raising the identical claim in

20   Humboldt County Superior Court. (EXHIBIT C.) On August 6, 2004,

21   Humboldt County Superior  Court issued an Order to Show Cause.

22

23

24       [3]    A copy of the Court of Appeal's opinion is attached at
     Appendix A.

25

26       [4]    A copy of the California Supreme Court's denial of
     petitioner's petition for review (S124676) is attached at Appendix B.

27       [5]    Exhibits are on file in the California Supreme Court (Case
28   No. S161374).

(EXHIBIT D.)  On September 12, 2005, Humboldt County Superior Court denied the writ based on this Court's decision in *People v. Black* (2005) 35 Cal.4th 1238 (*Black I*), which had concluded that *Blakely* did not apply to sentencing in California.  (EXHIBIT E.)

On October 5, 2005, petitioner filed a writ in the Court of Appeal, raising the identical claim for exhaustion purposes; on October 6, 2005, the writ was denied (A111580), citing *People v. Black I, supra,* 35 Cal.4th 1238.  (EXHIBIT F.)  Petitioner renewed the writ raising the identical claim again in this Court on October 17, 2005; the writ was denied on July 26, 2006 (S138037).  (EXHIBIT G.)

On January 31, 2007, Richard Braucher of the First District Appellate Project filed a new writ petition, on petitioner's behalf, in Humboldt County Superior Court, raising the identical *Blakely* claim, in light of *Cunningham v. California* (2007) 549 U.S. ___, 127 S.Ct. 856, which had overruled *Black I.*  (EXHIBIT H.)  On February 22, 2007, Humboldt County Superior Court issued an OSC.  (EXHIBIT I.)  On July 13, 2007, Humboldt County Superior Court denied the writ solely on grounds that "Cunningham does not apply retroactively to petitioner's case that is already final."  (EXHIBIT J.)

Humboldt County Deputy Public Defender Jonathan McCrone, who had represented petitioner at the OSC proceeding,  repeatedly promised to file papers in the Court of Appeal or this Court for review of the Superior Court's denial of the writ on retroactivity grounds.   When it became clear with the passage of time that Mr. McCrone was not going to do so, Richard Braucher of the First District Appellate Project stepped in to preserve petitioner's rights, by immediately filing a new writ in the Court of Appeal on February 14, 2008.  (EXHIBIT K.)  (*In re Crockett* (2008) 159 Cal.App.4th 751.)  On February 21, 2008, the Court of Appeal denied the

3

1    writ.  (See Case No. S161374 "Appendix A".)  On March 3, 2008,

2    petitioner filed a writ raising the identical claims in the California Supreme

3    Court, which was denied on  April 9, 2008.[6]

---

6        A copy of the California Supreme Court's denial of the writ
(S161374) is attached at Appendix C.

4

# ARGUMENT

I.  **THE PROSECUTOR COMMITTED PREJUDICIAL MISCONDUCT BY ELICITING TESTIMONY THAT PETITIONER HAD A "RIGHT" TO A PRE-PRELIMINARY HEARING LINEUP AND ARGUING TO THE JURY THAT IT COULD DRAW A NEGATIVE INFERENCE FROM HIS FAILURE TO AVAIL HIMSELF OF THAT RIGHT**

## A.  Introduction and Background

At trial, the prosecutor asked Detective Parris, "Now, you are aware, were you not, *that prior to the time of the preliminary hearing, the defendant is entitled to demand a live lineup.?* He replied, "Yes." The prosecutor continued: "Okay. Was any such demand made in this case?" Defense counsel immediately objected that "this unfairly shifts the burden. It is akin, I think, to a *Doyle* error, basically and would move to strike and ask that the jury be admonished that what the defendant says or does is not admissible." (RT 1752)

The court heard further argument outside the presence of the jury and then denied defense counsel's motion. (RT 1756) The prosecutor did not advert to the subject again in his examination of Detective Parris, but near the conclusion of his rebuttal closing argument he said: "We know from Detective Parris, you know, that the defendant has a right to a live lineup. Bring the witnesses in, see them in the flesh. You don't have to – there's some concern about the validity of the identification. You have a right to that. No such lineup was ever requested. Parris didn't put one on because Parris was satisfied with the – with the accuracy of the identifications that he had. No need for it. This – this kind of argument where you're saying that you've got a tainted lineup and all of this is something that could have been cleared up early on and wasn't, that's akin to me – to like the Mendes (sic.) Brothers who killed their parents and then

come into court and say: feel sorry for me because I'm – I'm an orphan."
(RT 1915)

**B.** **As the Prosecutor's Questioning and Argument about His Failure to Demand a Lineup, in Effect, Asked the Jury to Use Petitioner's Silence Against Him and Improperly Shifted the Burden of Proof, it Was Akin to Error under *Doyle v. Ohio* (1976) 426 U.S. 610 and *Griffin v. California* (1965) 380 U.S. 609**

Despite the prosecutor's contrary implication, the "right" to a lineup is not, unconditional, but is in fact much more restricted, as any California prosecutor should know. "We do not hold. . . that in every case where there has not been a pretrial lineup the accused may, on demand compel the People to arrange for one.  Rather, as in all due process determinations the resolution here to be made is one which must be arrived at after consideration not only of the benefits to be derived by the accused and the reasonableness of his request but also after considering the burden to be imposed on the prosecution, the police the court and the witnesses." (*Evans v. Superior Court* (1974) 11 Cal. 3d 617, 686; accord, *People v. Williams* (1997) 16 Cal.4th 153, 235)  Thus, the prosecutor's comments were misleading misstatements of the law.

More importantly, the prosecutor's question and comments transformed petitioner's attenuated *right* to request a lineup into an *obligation* to request a lineup, a duty to create the evidence that would either clear him or condemn him.  The prosecutor's unmistakable implication, and the adverse inference he invited the jury to draw, was that a truly innocent man would have asked for a live lineup because a live lineup would have exonerated him.  Thus, the prosecutor in effect asked the jury to use petitioner's silence – his failure to come forward with evidence of his innocence, to "speak up" as it were, before the preliminary hearing – against him.  As such, the sought-for inference suffered from a number of

6

constitutional vices. As defense counsel suggested, it was "akin" to *Doyle* [7]

error, the impeachment of the defendant's testimony with his post-arrest

silence after he has been advised that his silence will not be used against

him. It is also – as defense counsel intimated when he argued the

prosecutor's area of inquiry shifted the burden of proof -- akin to *Griffin* [8]

error in that it also violates the *presumption* of innocence that places the

entire burden of producing evidence on the prosecution, and absolves the

accused of any burden whatsoever to come forward with evidence of his

innocence. (See e.g., CALJIC No. 2.90; 2.60 ["you must not draw any

inference from the fact that a defendant does not testify"] & 2.61["No lack

of testimony on defendant's part will make up for a failure of proof by the

People so as to support a finding against him. . . ."]   The prosecutor's

question and comments in argument constituted misconduct of federal

constitutional magnitude.

Courts have consistently found in various contexts that it is

prosecutorial misconduct to comment adversely on the defendant's exercise

of constitutional or statutory rights. Thus, for example, it has been held to

be error akin to *Doyle* and *Griffin* error to permit a prosecutor to use

evidence of the defendant's exercise of his Fourth Amendment right to

refuse to police entry in to his home in order to show consciousness of guilt.

"'The right to refuse [entry] protects both the innocent and the guilty, and to

use its exercise against the defendant would be, as the court said in *Griffin*,

a penalty imposed by courts for exercising a constitutional right.'" (*People

v. Keener* (1983) 148 Cal. App.3d 73, 79)

Likewise, the prosecutor's comments here, like those in *People v.*

---

[7] *Doyle v. Ohio* (1976) 426 U.S. 610.

[8] *Griffin v. California* (1965) 380 U.S. 609.

*Conover* (1966) 243 Cal.App. 2d 38 targeted for adverse scrutiny the defendant's failure to assert a right at the preliminary hearing stage of criminal proceedings. In *Conover*, the right at stake was the right to produce witnesses at the preliminary hearing. The *Conover* court held: "[N]o unfavorable inference should be drawn against the accused because he did not by his own evidence raise a conflict as to his guilt. The determination of his guilt was an issue to be tried in superior court. As a consequence, the practice of not offering evidence on behalf of the defendant at a preliminary hearing is well-known and frequently adhered to, of which we are sure the prosecutor must have been well aware. We think the prosecutor's remarks improper." (243 Cal. App.2d at p. 49)

Similarly, in *People v. Lindsey* (1988) 205 Cal.App. 3d 112, the prosecutor in the rebuttal portion of closing argument lambasted defense counsel for letting her supposedly innocent client sit in jail and go through a preliminary hearing instead of informing the District Attorney's Office of appellant's alibi. As here, defense counsel's objection was overruled by the court. The *Lindsey* Court found the prosecutor's argument to be misconduct violative of *Doyle* and reversed Lindsey's conviction. The court considered it immaterial that the prosecutor's comments were aimed at defense counsel rather than the defendant, because "the prosecutor's condemnation of counsel for failing to reveal the alibi defense was tantamount to condemnation of the defendant himself for failing to do so." (205 Cal.App.3d at p. 117)

The Court of Appeal held: "Questions and arguments about appellant's ability to make such a request permissibly referred to his failure to develop exculpatory evidence; they were not aimed at the exercise of his right to remain silent and were not likely to be understood by the jury as reflecting on that right." (Appendix A at p. 12.) We disagree. But by

8

commenting on his failure to assert a right, even a qualified one, to a lineup the prosecutor was in effect asking the jury to infer that the logical witness he did not call was *himself.* This was misconduct violative of *Griffin* and *Doyle.*

### C. As the Court of Appeal's Entire Premise That a Live Lineup after a Photo Lineup Could Have Produced Exculpatory Evidence Is False, it Unfairly Plays upon the Misperceptions of Jury

The Court of Appeal's holding "Questions and arguments about appellant's ability to make such a [live lineup] request permissibly referred to his failure to develop exculpatory evidence" is based on the premise that a live lineup after a photographic lineup would or could clear up any misidentification (i.e., produce exculpatory evidence. (Appendix A at p. 12.) The problem with this premise is that it is **false.**

It has been established that information acquired after witnessing an incident may be inadvertently integrated into memory for the event itself. Once this occurs it is often impossible to separate them out. Typical sources of such contamination are newspaper reports, comments of other witnesses, and leading questions. Studies show that a common form of post-event contamination in criminal proceedings occurs when the witness erroneously identifies a defendant on a photo lineup. With that photograph now clear in the witness's mind, he then identifies the defendant with great certainty and conviction at the preliminary hearing and trial. As such, the photo lineup itself is actually a form of contaminating post-event information. (E. F. Loftus, J. Doyle, Eyewitness Testimony, 3d (1997) Lexus Law Publisher, Charlottesville, VA, pp. 54-57, 131, 371; B. Cutler, Eyewitness Testimony (2002), Nat'l Institute for Trial Advocacy, Notre Dame L. S., pp. 42-43; J. Doyle *Two Stories of Eyewitness Error* (Nov. 2003) The Champion, at pp. 24-28.)

1    Accordingly, the Court's **entire** premise that a live lineup after a

2    photo lineup would or could have produced exculpatory evidence (if

3    petitioner had only requested one) is **false**.   It plays upon the

4    misperceptions of jury every bit as much as the prosecutor's closing

5    argument in *People v. Lindsey* (1988) 205 Cal.App. 3d 112, 117, in which

6    he lambasted defense counsel for letting her supposedly innocent client sit

7    in jail and go through a preliminary hearing instead of informing the

8    District Attorney's Office of petitioner's alibi.   Consistent with the

9    reasoning of *Lindsey*, the implication that a post photo lineup would have

10   resolved issue **is unfair simply because it is not true**.

11   But the problem does not end with the factually erroneous premise

12   that a live lineup after a photo lineup would produce exculpatory evidence.

13   With this opinion, prosecutors across the state of California will now be

14   permitted to argue a fallacy as gospel truth to the jury at closing argument.

15   As the argument will have occurred at closing, the defendant will not be

16   afforded the opportunity to correct the matter for the jury.   It will be too late

17   to call an expert witness to testify as to the fallacy.

18   Courts have recognized that eyewitness identification is not an exact

19   science and is a topic beyond the comprehension of the average juror

20   necessitating the assistance of expert testimony in appropriate cases.

21   (*People v. McDonald* (1984) 37 Cal.3d 351.)   The United States Supreme

22   Court noted "[t]he vagaries of eyewitness identification are well-known; the

23   annals of criminal law are rife with instances of mistaken identification."

24   (*United States v. Wade* (1967) 388 U.S. 218, 228.)   The fact that the

25   accuracy of an eyewitness's identification is dependent upon many factors

26   is now embodied in CALJIC No. 2.92.   Thus, courts have for years

27   recognized that eyewitness identifications are fraught with inaccuracies.

28   The Court of Appeal's opinion fails to recognize these well-documented

difficulties.[9]

The prosecutor's question and comments violated petitioner's due process rights and it cannot be said that the violation was harmless beyond a reasonable doubt.   (*Chapman v. California* (1967) 386 U.S. 18.)

---

[9]

This is no small matter.  Of the first 100 wrongful convictions proven by DNA technology, over 80 percent relied to an important extent on sincere, confident, mistaken eyewitnesses.   (J. Dwyer, B. Scheck and P. Neufeld, *Actual Innocence* (2000).

## II. THE TRIAL COURT ERRED IN PERMITTING THE PROSECUTOR TO EXERCISE A PEREMPTORY CHALLENGE AGAINST THE SOLE PROSPECTIVE AFRICAN-AMERICAN JUROR SOLELY ON THE BASIS OF PRESUMED GROUP BIAS, VIOLATING PETITIONER'S CONSTITUTIONAL RIGHT TO EQUAL PROTECTION UNDER *BATSON V. KENTUCKY* (1986) 476 U.S. 79

### A. Introduction and Background

The prosecutor exercised six peremptory challenges. With the first of these he excused the sole African American among 55 prospective jurors who were voir dired. (CT 188-201)  In response to the court's general questions to the venire, Ms. G. volunteered she had a "brother who didn't meet his probation officer on numerous occasions," and "had a cousin that was convicted of a charge." (RT 102)  She did not know what her brother's charges were, and was not asked by the court about her cousin's conviction. Both cases occurred in counties other than Humboldt.  She said she could be fair. (RT 102-103)  She said she wasn't sure it counted as law enforcement experience, but she had gone through law enforcement training with the forest service four years earlier "to write citations and whatever." She wasn't really "enforcing," just patrolling.  She was also a ticket dispatcher and writer for  the College of the Redwoods. (RT 108-109) Again, this experience would not affect her ability to be fair. (*Id.*)  She had lived in the area for seven years, and had moved from Arcata to Eureka two weeks earlier.  She was single and childless.  She graduated from HSU. She had worked for the Forest Service as a file Tech and a forest Tech for about 10 years, but she had been a direct care worker for two and a half years. (RT 128)

In response to defense counsel's questions she elaborated that she currently worked at a care home, and that she had done seasonal, on and off work for the Forest Service. (RT 149) She said she could be fair.  (RT 150) In response to the prosecutor's questions she said she had majored in

forestry in college, and that as a direct care worker she worked in one of two homes, wherever she could find work. Asked what her law enforcement training by the forest service consisted of, she said "it was law enforcement level one and I guess that is really just the basics, like, um, how to maintain your appearance, your stance, just basic stuff, who in the – like subordinate, who in the hierarchy, who would you call on if the situation would rise to something out of my hands, who would I call on and everything." (RT 195) Asked if she had "ever ha[d] any sort of situation where there was a confrontation with somebody because of your position in the forest service," she answered yes. Asked if any charges had been brought against anyone as a result, she said no, it had been resolved. (RT 196) In response to his question about her campus security job at CR, she reiterated she had been a citation writer. (RT 196) He did not ask about her ability to be fair. He did not ask about the nature of her cousin's out of county conviction.

As noted, the prosecutor's first peremptory challenge was against Ms. G. (RT 387) Defense counsel immediately made a *Batson/Wheeler*[10] motion. (RT 388) Defense counsel stated, and all agreed, she was the only black person on the panel. (RT 388-389). Defense counsel continued: "She expressed no reservations about her ability to be fair. She's got experience, family related experience with the criminal justice system. She's worked in a, sounds like, a quasi law enforcement capacity and had some basic law enforcement training. She's well educated. And I can think of no reason why a peremptory challenge ought to be granted."

The prosecutor responded that he understood he was required to explain his reasons for exercising the challenge once the court finds a *prima*

---

[10]     *People v. Wheeler* (1978) 22 Cal.3d 258.

13

1   *facie* showing that challenge was exercised "solely because – for, partially, I

2   guess, because the individual belonged to a particular group." (RT 389)

3   The prosecutor did not address himself to the question of whether a *prima*

4   *facie* case had been shown but rather gave a plethora of reasons justifying

5   his use of a peremptory challenge against Ms. G, including that G.'s brother

6   and cousin had been convicted of crimes, and "found [it] highly unusual"

7   that she was unaware of the charges against the brother. He admitted that

8   the potential jurors were not "excited about the voir dire process," but

9   noticed that G. had her arms crossed before any questions were asked and

10  "appeared to be especially bored." He saw that G. sat apart from the rest of

11  the jurors during a break; that behavior and the confrontation she reported

12  having at the Forest Service made him worried that she would not get along

13  with the other jurors. He found G.'s claim to law enforcement training

14  "somewhat self-inflating," and suspected that she had been fired from the

15  Forest Service because she no longer worked there despite having a forestry

16  degree. He thought that defense counsel had a rapport with G. and that she

17  was "overly impressed" with defense counsel; he worried that he might

18  "have offended [G.] in some fashion." (RT 388-398.)

19      Defense counsel replied that he had not observed anything

20  suggesting that Ms. G. would be unfit to serve on the jury. Counsel thought

21  much of what the prosecutor said was "sheer speculation"; Ms. G., for

22  example, might have left the Forest Service voluntarily and not been fired.

23  Counsel submitted that Ms. G. was attentive, honest, and articulate in voir

24  dire.

25      The court ruled that the defense had not made a prima facie case that

26  S. G. was excused because of her race, and that the prosecutor had in any

27  event given valid neutral reasons for the challenge.

28      The trial court erred in concluding that petitioner had not made a

14

*prima facie* showing of race-based discrimination in the district attorney's

peremptory challenge of Ms. G., the sole African American juror in the

entire jury venire, and in ruling that the district attorney's reasons for

exercising the challenge were, in any event, race-neutral.

### B.    *Batson* Principles and Analysis

Under federal law, the use of peremptory challenges to strike

prospective jurors solely on the basis of presumed group biases violates the

defendant's, as well as the prospective juror's, constitutional right to equal

protection of the laws. (*Batson v. Kentucky* (1986) 476 U.S. 79.)

The *Batson* inquiry requires a three step analysis. "[O]nce the

opponent of a peremptory challenge has made out a prima facie case of

racial discrimination (step one), the burden of production shifts to the

proponent of the strike to come forward with a race-neutral explanation

(step two). If a race-neutral explanation is tendered, the trial court must then

decide (step three) whether the opponent of the strike has proved purposeful

racial discrimination." (*Purkett v. Elem* (1995) 514 U.S. 765, 767; *Miller-el*

*v. Cockrell* (2003) 537 U.S. _____;123 S.Ct. 1029, 1040)

The Court of Appeal affirmed, holding, "On the foregoing record,

even assuming that a prima facie case of discrimination had been

established, the prosecution met the burden of showing that the challenge

was not predicated on group bias." (Appendix A at p. 21.)

> S.G.'s family member's negative experiences with law
> enforcement were a well-recognized valid ground for the
> peremptory challenge. (*People v. Gutierrez* (2002) 28 Cal.4th
> 1083, 1123-1124; People v. Turner [(1994) 8 Cal.4th [137,]
> 171.) The prosecutor also made various observations and
> judgments of S. G.— she was not forthcoming about the
> charges against her brother, she was bored by the proceedings,
> aloof from other jurors, and enamored of defense
> counsel—that constituted reasonable, race-neutral grounds for
> challenging her. (*People v. Reynoso* (2003) 31 Cal.4th 903,
> 917 [well settled that challenge may be based on counsel's
> personal observations].)
> Accordingly, the court did not err in denying the

1    *Wheeler* motion.

2    (Appendix A at pp. 21-22.)

3    In so holding, the Court of Appeal refused to permit a comparative analysis

4    of jurors who also had negative experiences with law enforcement but were

5    not challenged. This also was erroneous. In *Miller-El v. Dretke* (2005) 545

6    U.S. 231, 239-252, the United States Supreme Court performed a

7    comparative juror analysis, in which the court reviewed the transcripts from

8    voir dire and compared the juror questionnaires of the challenged and

9    seated jurors. In *Boyd v. Newland* (9th Cir. 2006) 467 F.3d 1139, the Ninth

10    Circuit reversed a California case, holding that without entire voir dire

11    transcript, California appellate courts could not have evaluated relevant

12    circumstances surrounding peremptory strike of an African-American juror,

13    as required by *Batson*. (*Id.,* at pp. 144-1145.) *Boyd* concluded, "Because

14    we hold that, under the clearly established Supreme Court precedent of

15    *Batson*, comparative juror analysis is an important tool that courts should

16    utilize on appeal when assessing a defendant's plausible *Batson* claim, we

17    also must conclude that all defendants, including those who are indigent,

18    have a right to have access to the tools which would enable them to develop

19    their plausible *Batson* claims through comparative juror analysis." (*Id.,* at

20    p. 1150.)

21    The excluded juror, who was the only African-American prospective

22    juror—in a county where African-American citizens were described by the

23    prosecutor as "a significant minority," but where petitioner, the victims and

24    all the non-law enforcement, percipient witnesses were African

25    American—was the subject of the prosecutor's very first peremptory

26    challenge. As a result, there was no comparative juror evidence to place

27    before the trial court. Thus, in evaluating the establishment of a *prima facie*

28    case of purposeful discrimination, or the *bona fides* of the prosecutor's

1    volunteered explanations, the trial court did not have the full picture before

2    it. A comparative juror analysis should be permitted in order to permit

3    petition to show "that a finding of pretext was warranted." (*Lewis v. Lewis*

4    (2003) 321 F.3d 824, 832.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

III. **IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND *BLAKELY V. WASHINGTON* AND *CUNNINGHAM V. CALIFORNIA*, THE TRIAL COURT ILLEGALLY IMPOSED THE AGGRAVATED TERM IN PETITIONER'S CASE**

A. **Introduction**

Before the California Supreme Court denied petitioner's petition for review, on June 24, 2004, the United States Supreme Court held in *Blakely v. Washington* that where state law establishes a presumptive sentence for a particular offense and authorizes a greater term only if certain additional facts are found (beyond those inherent in the plea or jury verdict), the Sixth Amendment entitles the defendant to jury determination of those additional facts by proof beyond a reasonable doubt. (*Blakely v. Washington* (2004) 542 U.S. 296, 301-302.) On July 15, 2004, petitioner filed a writ of habeas corpus in the Court of Appeal, contending that the trial court unlawfully imposed the aggravated terms in petitioner's case under *Blakely*. On July 22, 2004, the Court of Appeal denied petitioner's writ of habeas corpus "without prejudice to the filing of the petition in Humboldt County Superior Court" (A107093).

On July 28, 2004, petitioner filed a writ raising the identical claim in Humboldt County Superior Court. On August 6, 2004, Humboldt County Superior Court issued an Order to Show Cause. On September 12, 2005, Humboldt County Superior Court denied the writ based on the California Supreme Court's decision in *People v. Black* (2005) 35 Cal.4th 1238 (*Black I*), which had concluded that *Blakely* did not apply to sentencing in California.

On October 5, 2005, petitioner filed a writ in the Court of Appeal, raising the identical claim for exhaustion purposes; on October 6, 2005, the writ was denied (A111580), citing *People v. Black I, supra*, 35 Cal.4th 1238. Petitioner renewed the writ raising the identical claim again in the

1    California Supreme Court on October 17, 2005; the writ was denied on July

2    26, 2006.

3         On January 31, 2007, Attorney Richard Braucher filed a new writ

4    petition, on petitioner's behalf, in Humboldt County Superior Court, raising

5    the identical *Blakely* claim, in light of *Cunningham v. California* (2007) 549

6    U.S. ___, 127 S.Ct. 856, which had overruled *Black I*.   On February 22,

7    2007, Humboldt County Superior Court issued an OSC.   Humboldt County

8    Deputy Public Defender Jonathan McCrone was appointed to represent

9    petitioner at the OSC proceeding.  On July 13, 2007, Humboldt County

10   Superior Court denied the writ solely on grounds that "Cunningham does

11   not apply retroactively to petitioner's case that is already final."

12        **B.    No Retroactivity Problems Attend Petitioner's Case
             Because it Was Not Yet Final at the Time *Blakely v.***

13        ***Washington* (2004) 542 U.S. 296 was Decided**

14        We assert that no retroactivity problems attend petitioner's case

15   because it was not yet final at the time *Blakely* was decided.  Accordingly,

16   the superior court's holding that  "Cunningham does not apply retroactively

17   to petitioner's case that is already final" was incorrect.

18        *Cunningham* stated that its holding arose out of *Apprendi* and

19   *Blakely*, stating that California's DSL violated *Apprendi*'s "bright line

20   rule." (*Cunningham*, at p. 869.) Accordingly, *Cunningham* does not

21   announce a "new rule of law" withing the meaning of *Teague v. Lane*

22   (1989) 489 U.S. 288, but instead is an application of those precedents.

23   Since petitioner's petition for review was pending when *Blakely v.*

24   *Washington* (2004) 542 U.S. 296 was decided on June 24, 2004, petitioner's

25   claims based on *Blakely* are cognizable and reviewable. *Cunningham* is

26   nothing more than an express reaffirmation of the legal principals which

27   were clearly set forth in *Blakely* for the sole purpose of invalidating the

28   decision of this Court in *Black I*. Put another way, there are no retroactivity

19

problems as to *Cunningham* because *Cunningham* merely held what petitioner has argued all along: that *Blakely* applies to California's Determinate Sentence Law (DSL).

*Cunningham* held that the decision in *People v. Black, supra,* 35 Cal.4th 1238, ruling that *Blakely* did not apply to the DSL, was wrong.[11] *Cunningham* held that because a DSL upper term requires findings of additional aggravating circumstances beyond the minimum elements of the offense, "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum" under *Apprendi v. New Jersey* (2000) 530 U. S. 466 and *Blakely v. Washington, supra,* 542 U.S. 296. (*Cunningham, supra,* 127 S.Ct. at p. 868.) "Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt [citation], the DSL violates *Apprendi*'s bright-line rule." (*Ibid.*) "Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent. [Fn.]" (*Id.,* at p. 871.)

As *Cunningham* merely reaffirmed of the legal principals of *Blakely,* which petitioner has argued all along apply to this case, there are no procedural impediments which would preclude application of *Cunningham* to petitioner's case.

/

---

[11]    "Contrary to the *Black* court's holding, our decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum. Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (*Cunningham,* at p. 871.)

C.    **As Confirmed by *Cunningham*, the Court's Imposition of the Aggravated Term Was Unauthorized under *Blakely* and in Violation of the Sixth Amendment, Because Petitioner Was Entitled to a Jury Determination of Those Additional Facts Exposing Him to the Possibility of a Sentence Greater than the Maximum Allowed by a Jury's Findings (In California: the Middle Term) by Proof Beyond a Reasonable Doubt**

In this case, a jury found petitioner guilty of two counts of assault with a semiautomatic firearm (Pen. Code, § 245(b)) against David Moore (count I) and against Keenin Ephraim, Delvin Hudson and Cameron Matthews (count II), and found true two personal use of a firearm (§ 12022.5 (a)) enhancement allegations attending each count. (CT 312-315.)

At sentencing, the court denied probation, and sentenced petitioner to the maximum term allowed by law: 22 years, four months in state prison (CT 333), calculated as follows: the aggravated term of 9 years on the assault with a semiautomatic firearm (§ 245(b)) against Keenin Ephraim, Delvin Hudson and Cameron Matthews (count II), designated as the principal term, plus an aggravated 10-year term for the personal firearm use enhancement (§ 12022.5 (a)) to be served consecutive with count II. As to the balance of the counts, the court ordered consecutive (§ 1170.1 one-third the midterm) sentences of two years for the assault with a semiautomatic firearm (§ 245(b)) violation in count I and 16 months for the personal firearm use enhancement (§ 12022.5 (a)) attending that count. (EXHIBIT A: RT 1989-1995; 2004.)

In choosing the aggravated term, the court stated:

Start with Count Two. The violation of Penal Code Section 245, subdivision (B), involving the shooting at victims Hudson, Effrium [sic] and Mathews [sic], which would be designated as the principal term, it is the Court's decision to impose the upper term of nine years for the following reasons: I have considered the circumstances in aggravation set forth in Rule 4.421, and the circumstances in

mitigation set forth in Rule 4.423.

Under Rule 4.421, the Court has considered and finds the following aggravating facts as they relate to Count Two: Under 4.421(a)(1), the crime involved great violence and the threat of great bodily harm. It involved shooting at a public parking lot [sic] at three victims. There were many other people present, as well.

Under 4.421(b)(4), the defendant was on probation, conditional revokable release on four separate misdemeanor cases at the time of this offense.

Under 4.421(b)(5), his performance on probation has not been satisfactory, and he has suffered prior violations and—in one of the cases, and clearly his juvenile probation performance was not satisfactory.

As to Count Two, the Court also considered as other aggravating circumstances as permitted under Rule 4.408, the defendant has accepted no responsibility for his actions. He fled the county. Initially has not ever expressed any remorse, or in any way acknowledged any wrongdoing, or accepted any responsibility for his conduct. Nothing in the probation report indicates otherwise. His letter to the Court does not indicate otherwise. And none of the evidence presented during the trial show anything differently.

(EXHIBIT A: RT 1990-1991.)

As discussed below, as confirmed by *Cunningham*, the court's imposition of the aggravated term was unauthorized under *Blakely* and in violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings (in California: the middle term) by proof beyond a reasonable doubt.

In *Cunningham*, the defendant was tried and convicted of continuous sexual abuse of a child under the age of 14 (§ 288.5, subd. (a)), punishable by imprisonment for a lower term sentence of 6 years, a middle term sentence of 12 years, or an upper term sentence of 16 years. At sentencing, the trial judge found by a preponderance of the evidence six aggravating circumstances, among them, the particular vulnerability of the victim, and the defendant's violent conduct, which indicated a serious danger to the

22

community. The judge found one mitigating fact, i.e., that the defendant had no criminal record. The court then concluded that the aggravating factors outweighed the mitigating factor, and imposed the upper term of 16 years. (*Cunningham v. California, supra,* 127 S.Ct. at p. 860-861.) *Cunningham*'s sentence was affirmed, citing *Black I,* which had concluded that *Blakely* did not apply to the DSL in California.

The United States Supreme Court held that this was error under *Apprendi v. New Jersey* (2000) 530 U. S. 466, 490,

> Under California's DSL, an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance. See *supra,* at --- - ----4-5. An element of the charged offense, essential to a jury's determination of guilt, or admitted in a defendant's guilty plea, does not qualify as such a circumstance. See *supra,* at --- - ----5-6. Instead, aggravating circumstances depend on facts found discretely and solely by the judge. In accord with *Blakely,* therefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum. 542 U.S., at 303, 124 S.Ct. 2531 ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (emphasis in original)). Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, see *supra,* at ----5, the DSL violates *Apprendi's* bright-line rule: Except for a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S., at 490, 120 S.Ct. 2348.

(*Cunningham,* at p. 868.)

As for the decision in *Black, Cunningham* summarized, "Contrary to the *Black* court's holding, our decisions from *Apprendi* to *Booker* point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum. Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent."

(*Cunningham,* at p. 871.) *Cunningham* reversed, concluding: "As to the

23

1    adjustment of California's sentencing system in light of our decision, '[t]he

2    ball ... lies in [California's] court.'" (*Ibid.*) *Cunningham* applies to

3    petitioner's case and requires the same result.

4         It is beyond dispute that the trial court's finding, "Under 4.421(a)(1),

5    the crime involved great violence and the threat of great bodily harm"

6    (EXHIBIT A: RT 1990) falls squarely within *Cunningham*'s prohibition on

7    judicial findings of current-offense aggravating factors.  Its comments that

8    the offense "involved shooting at a public parking lot [sic] at three victims"

9    and that "[t]here were many other people present, as well" are precisely the

10   kind of judicial findings of historical facts of the offense proscribed by

11   *Cunningham*.  The same is true of the trial court's findings that, under rule

12   4.408, petitioner "has not ever expressed any remorse, or in any way

13   acknowledged any wrongdoing, or accepted any responsibility for his

14   conduct." (EXHIBIT A: RT 1990-1991.)   These findings plainly violate

15   *Cunningham*.

16        The two remaining stated aggravating factor findings—that "[u]nder

17   4.421(b)(4), the defendant was on probation, conditional revokable release

18   on four separate misdemeanor cases at the time of this offense" and "Under

19   4.421(b)(5), his performance on probation has not been satisfactory, and he

20   has suffered prior violations and—in one of the cases, and clearly his

21   juvenile probation performance was not satisfactory (EXHIBIT A: RT

22   1990)—also contravene *Cunningham*.

23        As all of the foregoing comments constitute judge-made findings

24   used to impose an upper term beyond those determined by the jury's

25   verdicts, they come within *Cunningham*'s prohibition.  None of these

26   constitute judicial recognition of the mere fact of a prior conviction. (See

27   *Almendarez-Torres v. United States* (1998) 523 U.S. 224.)

28        Here, the trial court's finding under rule 4.421(b)(5) that petitioner's

24

performance on probation was unsatisfactory (EXHIBIT A: RT 1990)
clearly manifests an inherently factual inquiry that goes beyond judicial
recognition of the mere fact of conviction, because it consists of an
evaluation or assessment of facts about which a jury might come to an
altogether different conclusion. The same is true of the court's comment
that under 4.421(b)(4) petitioner was on probation at the time of this
offense. The findings are prohibited by *Cunningham*.

For these reasons, petitioner had a federal constitutional right to a
jury trial on the facts underlying the aggravating factors used to impose the
upper term in this case.

*Blakely* error is reviewed under the harmless error standard set forth
in *Chapman v. California* (1967) 386 U.S. 18, as applied in *Neder v. United
States* (1999) 527 U.S. 1. (*People v. Sandoval* (2007) 41 Cal.4th 825, 838,
*Washington v. Recuenco* (2006) 548 U.S. 212.) In making this
determination, a reviewing court "must determine whether, if the question
of the existence of an aggravating circumstance or circumstances had been
submitted to the jury, the jury's verdict would have authorized the upper
term sentence." (*People v. Sandoval, supra,* at p. 838.)

Here, imposition of the aggravated term, in general, was hotly
contested. (EXHIBIT A: RT 1995-1998.) The court's findings were not
supported by overwhelming evidence. Harmless error analysis, therefore,
does not withstand *Neder* scrutiny. (*Neder,* 527 U.S. at p. 18-19.)
*Cunningham* error here was not harmless beyond a reasonable doubt.
Accordingly, even under *Chapman*, the error nevertheless requires reversal.

**IV. IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND *BLAKELY V. WASHINGTON*, THE TRIAL COURT ILLEGALLY IMPOSED THE AGGRAVATED TERM FOR THE ENHANCEMENT IN PETITIONER'S CASE**

The court's imposition of the aggravated term of 10 years for the personal use of a firearm (§ 12022.5 (a)) enhancement allegation relating to count II was also unauthorized under *Blakely* and in violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings (in California: the middle term) by proof beyond a reasonable doubt. In imposing the aggravated term for the personal use of a firearm (§ 12022.5 (a)) enhancement allegation relating to count II, the court gave these reasons:

> In aggravation was to the enhancement, again related to Count Two, the Court finds the following: Under Rule 4.421(b)(1), the defendant has a history of engaging in violent conduct, indicating a serious danger to others. Even given his age, he has in the past engaged in serious violence on numerous occasions. His juvenile record includes numerous incidents involving fighting, weapons, threatening others, being found in possession of a loaded .22 semiautomatic pistol, and also suffered a conviction of 246, discharging a firearm at an occupied motor vehicle. On that he was committed to the Youth Authority. Clearly, the incident that occurred in this particular case before the Court is not an isolated incident of violence, or violent conduct apparently, was not new to Mr. Lewis.

> Under 4.421(b)(2), the defendant's prior convictions as an adult and sustained petitions in juvenile court, are of numerous and increasing seriousness. In 1992, the defendant, as a minor, admitted offenses of fighting, 415. After that he had a 242, a battery involving he and another minor with a chain. In 1994, we have a 12101(a) having to do with possession of a loaded pistol. '95, there is [sic] also other additional numerous charges including the Penal Code Section 246, having to do with the shooting at an occupied vehicle. The conviction resulted in a commitment to the Youth Authority.

> As an adult, he's suffered four misdemeanor convictions already, including Vehicle Code Section 2800.2. He has a lengthy history and is of increasing seriousness [sic].

26

Under Rule 4.421(b)(3), it is an aggravating factor, the defendant has served time in the California Youth Authority.

(EXHIBIT A: RT 1991-1992.)

The court's imposition of the aggravated term was unauthorized under *Blakely* and in violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings (in California: the middle term) by proof beyond a reasonable doubt.

The court's findings under rule 4.421(b)(1), (2), and (3) all involve factual inquiries, exceeding judicial recognition of the mere fact of conviction, in that they all consist of evaluation or assessment of facts about which a jury might come to an altogether different conclusion. To the extent the trial court's exercise of discretion is influenced by the facts of the case, as they are here, judicial factfinding proscribed by *Blakely* enters the sentencing process.

Even if the court's final finding (that petitioner served a term in CYA under rule 4.421(b)(3)) is considered a fact of a prior conviction (which petitioner does not concede), the lion's share of the judicial findings strictly forbidden by *Blakely*. Allegations of prior juvenile adjudications to enhance a sentence come within *Apprendi*'s "prior conviction" exception, because, unlike in adult cases, juveniles do not have the right to jury trial. (*United States v. Tighe* (9th Cir. 2001) 266 F.3d 1187, 1194 ["Juvenile adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-doubt burden of proof, therefore, do not fall within Apprendi's 'prior conviction' exception"].)   For the reasons already discussed in the preceding argument, as imposition of the aggravated term, in general, was vigorously contested (EXHIBIT A: RT 1995-1998) and the court's findings

27

1   were not supported by overwhelming evidence, harmless error analysis does

2   not survive *Neder* scrutiny.  (*Neder*, 527 U.S. at p. 18-19.)  Accordingly,

3   even under *Chapman*, the *Blakely* error requires reversal.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

Because the above errors violated petitioner's constitutional rights and because the state court's decision was contrary to clearly established federal law and was based upon an unreasonable determinations of the facts, petitioner requests that the Court grant a writ of habeas corpus and order his release forthwith. 28 U.S.C. § 2254(d).

## PRAYER FOR RELIEF

For the above reasons, petitioner requests that this Court:

1.      Issue a writ of habeas corpus to have petitioner brought before it, to the end that he might be discharged from his unconstitutional confinement and restraint;

2.      When the Clerk files the petition as provided in Rule 3(b) of the Rules Governing § 2254 cases, direct the United States Marshal to serve a copy of this petition on respondent and direct respondent to file an answer admitting or denying each and every factual allegation and claim made herein;

3.      Order respondent to produce the transcripts of petitioner's trial, appeal, and all other relevant proceedings, with the records of all the same including the appellate record;

4.      Conduct a hearing at which proof may be offered to support the allegations contained in the petition and to rebut any procedural or substantive defenses asserted by respondent;

5.      Order discovery on behalf of petitioner, pursuant to Rule 6 of the Rules Governing § 2254 cases;

6.      Permit petitioner a reasonable opportunity to supplement this petition to include claims which become apparent from further investigation and research and to develop fully the facts and law of all the claims raised herein;

7.    Permit petitioner, who is indigent, to proceed without prepayment of costs or fees and grant him authority to obtain subpoenas without fees for witnesses and documents necessary to prove the facts alleged in this petition;

8.    Appoint counsel to represent petitioner in these proceedings, as requested in the separately filed motion for appointment of counsel; and

9.    Grant such other and further relief as this Court deems just and appropriate and as justice may require.

Dated: _April 30, 2008_                    Respectfully submitted,

MILTON LEWIS, JR.
Petitioner, pro se

**APPENDIX A**

LKbl

RECEIVED

MAR 3 0 2004

First District
APPELLATE Project

COPY

Filed 3/30/04

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

# FILED

MAR 3 0 2004

Court of Appeal - First App. Dist.
**DIANA HERBERT**
By_____
DEPUTY

THE PEOPLE,

     Plaintiff and Respondent,

v.

MILTON LEWIS, JR.,

     Defendant and Appellant.

A098387

(Humboldt County
Super. Ct. No. CR005997S)

     Appellant Milton Lewis, Jr. was convicted by a jury of two counts of assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)), and with personal use of a firearm (Pen. Code, § 12022.5, subd. (a)). He was sentenced to 22 years and 4 months in prison. In this appeal, he raises issues of prosecutorial misconduct, and *Wheeler* (*People v. Wheeler* (1978) 22 Cal.3d 258) and instructional error. In the published portion of this opinion, we hold that the prosecutor did not commit misconduct by referring in questioning and argument to appellant's failure to request an *Evans* (*Evans v. Superior Court* (1974) 11 Cal.3d 617) lineup. We conclude that the other claims of error also lack merit and affirm the judgment.

## I. BACKGROUND

     The assaults took place around 2:00 a.m. on December 16, 2000, in the parking lot of a Denny's restaurant in Eureka. The assailant hit David Moore in the neck with a gun (count one), and fired two shots in the direction of Keenin Ephriam, Cameron Matthews,

---

[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B., II.C. and II.D. of Discussion.

Delvin Hudson, and Lawrence Bady (count two). Over 15 witnesses at the scene testified to what transpired. The issue in the case was whether appellant was the assailant.

Ephriam, Matthews, Hudson and Bady, students at Humboldt State University (HSU), went to Denny's in Ephriam's gold Sentra. HSU students Moore and Timothy Hair went there with Keion Morgan in Morgan's green Civic. Before the Civic and Sentra arrived at Denny's, a group of appellant's friends and acquaintances had gathered there, including: Tyvonne Latimer, Jacoby Achane, Donald Bell, Palavi Vainuku, Mo Charlo, Porsche Charlo, Emily Petra, Dee Dee Prudhomme, and Yolanda George. Everyone was coming from Club West, which had closed at 1:00 a.m. Appellant, who was known as "J.R.," went to the club with Latimer, Achane, and Bell in a white Altima rented to Achane's mother. George testified that appellant went to Denny's with Porsche, Petra, Prudhomme, and her in Prudhomme's van. George said that she sat on appellant's lap during the trip, and felt something hard, like a gun, in his waistband. She turned and looked at the object and saw something shiny.

Ephriam had an argument with appellant outside the club after it closed. Ephriam denied at trial that appellant threatened to "blow [his] brains out" during the argument, but acknowledged reporting words to that effect to the police on the night of the incidents. The argument between Ephriam and appellant was followed by a fistfight between Ephriam's friend Matthews and appellant's friend Porsche, which the police broke up. Eureka Police Officer James Jones saw appellant near the club when he was dispatched to the disturbance, and reported later that night that appellant had his hair in cornrows, and was wearing a red short-sleeved shirt and dark baggy pants.

Morgan drove the Civic to Denny's with Moore in the passenger seat and Hair in the back. Morgan stopped the car in the middle of a group of people in the parking lot to talk to Porsche. Moore testified that a man came around to his side of the car, opened the door, pulled out something shiny that appeared to be a gun, and hit him with something on the neck. Morgan told Eureka Police Detective David Parris later that night that the assailant had asked, "Was it one of you all who did it?" and pulled a chrome handgun out of his waistband and hit Moore with it. Moore lunged toward the driver's side of the car

after he was hit and, according to a taped statement given by Vainuku, asked Porsche to "tell him it wasn't us." In his statement, Vainuku said that Porsche was angry and grabbed appellant; people were telling appellant to put the gun away, but Achane said, "let his ass go to jail." In his taped statement, Mo said that a green car pulled into the parking lot, and he saw appellant, who appeared to be drunk, walk up to the car and pull out a gun. Mo saw the man in the passenger seat jump to the other side of the car, but did not see appellant hit the man with the gun.

When they were interviewed by Parris later that night, Moore, Hair and Morgan were shown two six-photo lineups: appellant was pictured in photo two in lineup one; Latimer was shown in photo two in lineup two. Latimer testified that people often confuse him with appellant, especially when their hair is braided.[1] Moore testified that he did not see his assailant's face. Moore identified Latimer as the assailant from the photo lineups, and told Parris that he had seen his assailant get into the white Altima at the club. Hair did not identify either appellant or Latimer from the photo lineups; he thought that the man depicted in photo six in one of the lineups resembled the assailant. Morgan identified appellant as the assailant from the lineups but declined to identify him in court. Morgan described appellant at trial as a "changed man," and testified that appellant was not the one who assaulted Moore.

After the assault on Moore, Morgan drove out of the parking lot toward the police station next to the restaurant. Ephriam saw Morgan's car leaving the lot as he was driving in. In her interview with Parris a few days after the incidents, Prudhomme said that when the gold car pulled into the other end of the lot, she tried to calm appellant down and hold him back. In their statements, Mo and Vainuku said that when the other car arrived, everyone pointed and said "there they are," "that's them." Ephriam recognized the man he had argued with at the club; people tried to hold the man back, but

---

[1] In the lineup photos, appellant's hair is braided and pulled back off his face and behind his head, while Latimer's hair is braided and falling to the side and over his face.

he broke away and walked toward Ephriam, Hudson, Bady, and Matthews as they were getting out of the car.

Ephriam testified that the man pulled out a silver gun and fired two shots; two .40 caliber shell casings were recovered by the police at the scene. Hudson testified that the man who had argued with Ephriam at the club came toward them and fired at them from the middle of the Denny's lot. Bady testified that when they got to Denny's he saw the men who had argued and fought with Ephriam and Matthews at the club, and that he heard shots as he was getting out of the car. Matthews testified that the men from the club were walking toward them, and that he was bent over, putting his shirt in the car prepared to fight again, when he heard the shots, so he did not see who fired the gun. In his statement, Mo said that he watched from close range as appellant pulled out a gun, ran toward the people in the car, and fired twice, pointing the gun straight toward the vehicle. In his statement, Vainuku said that appellant walked over, pulled out a gun, fired twice, and tried to fire again but the gun jammed.

Ephriam and Hudson identified appellant from the photo lineups and in court as the shooter. Bady and Matthews, who did not see the shots fired, identified appellant from the photo lineups as the man who had argued with Ephriam. Matthews "guaranteed" that he could identify the assailant when he saw the photo lineup, and reiterated his identification of appellant at trial. Bady stood next to Ephriam during the argument with appellant; he and Hudson testified that they got a good look at appellant at that time. Ephriam testified that he stood a foot and a half away from appellant during the argument, in an area illuminated by street lamps.

In court or in their interviews with Parris, Ephriam, Hudson, Bady, and Matthews said that appellant had his hair braided and was wearing a red shirt on the night of the incidents. Tracy Gothier, a Eureka police dispatcher, was working at the police station next to Denny's at 1:51 a.m. that night when she heard shots and went to her second story window overlooking the well-lit restaurant parking lot. She testified that there were many people out in the lot, and that she observed a slender African-American man with

4

braided hair in a baggy white sweatshirt standing by a car holding a silver gun.[2] She broadcast a report of a shooter wearing a white sweatshirt.

When the shots were fired, Matthews dove into the back seat of the Sentra, and Ephriam, Hudson, and Bady ran out of the parking lot toward the police station. Hudson reported to Parris that when he got to the police station and looked back, he saw their assailant get into and out of the white Altima in the Denny's lot. In his statement, Vainuku said that people were telling appellant to "get out of [t]here," and that he saw appellant leave the scene. Hair, riding with Morgan and Moore, saw Ephriam, Hudson, and Bady running down the street; Morgan picked them up and they returned to the Denny's lot.

Officer Todd Wilcox arrived at Denny's looking for an African-American male in a white sweatshirt, but based on descriptions of the shooter at the scene, started looking for someone with cornrows wearing a red shirt and red shoes. Ephriam, Matthews, and Hudson reported that night that the assailant wore a red shirt, red shoes, and blue jeans. They and Bady described the assailant as a man in his 20's, 5'7" to 5'10"; Matthews said that the man was thin, and Bady estimated that he weighed 160 pounds. Morgan thought that the assailant was 5'7" and 145 pounds; Moore said that the assailant was 5'9" or 5'10" and 160 pounds, and that he was wearing a red shirt, long red jacket, and jeans; Hair described the assailant as a 19 or 20 year old wearing a red shirt. When Petra was interviewed a few days after the incidents, she recalled that appellant wore a red shirt and blue jeans that night. Appellant is 5'10" and weighed 145 pounds when he was taken into custody a month later.

In her interview, Petra said that Latimer wore a red and beige plaid shirt and a jean jacket that night, and she testified at trial that he usually wears braids. Wilcox questioned a man at Denny's in cornrows and a red shirt and shoes; the man was wearing a wide-striped shirt under a black jacket. The man had a Hertz key ring and no identification.

---

[2] Gothier, like Ephriam, Bady, and Matthews, testified that the shooter's braids were pulled back off his face.

Wilcox let the man go without getting his name because the assailant was described as someone wearing a solid red shirt. At trial, Achane recalled the police interviewing Latimer at Denny's. Latimer testified that the police frisked him, said "you're J.R.," and then let him go. Latimer told Parris that he had worn a "shiny dark outfit" and red tennis shoes that night; he could not remember at trial whether his hair had been braided. Latimer testified that he did not have a gun that night and denied committing the assaults.

Officer Wilcox testified that he had contact with appellant several months after the incidents, in August 2001, when he went to appellant's house to investigate a vandalism. He said he recognized appellant on that occasion as the man in the striped shirt he had questioned at Denny's. When Wilcox later saw appellant's photo lineup, he told Parris he recalled talking to appellant that night, and he prepared a supplemental report of the encounter after reporting it to Parris. Although Wilcox was "100 percent confident" that he had questioned appellant at Denny's, the prosecution argued that he had talked to Latimer, not appellant.

The man Wilcox questioned at Denny's said that his Hertz ring was for keys to a friend's car. He said that he had been the designated driver, and had gotten the keys from Petra. Petra had the keys that matched the ring, but refused to tell Wilcox who gave them to her. Achane told Wilcox that he had given Petra the keys to roll up the windows on his mother's white Altima. Latimer and Achane said that Latimer drove Bell and them to Denny's in Achane's car; Achane said he had been too drunk to drive.[3] Achane testified that he drove appellant, Latimer and Bell to the club, but that appellant was "goin' out of town" and did not go with them to Denny's. An identification card with Latimer's name

---

[3] When Achane was interviewed at the scene he said that he had driven to Denny's alone. Although Achane, a convicted felon, insisted at trial "I'm a honest dude," Parris said that he had interviewed Achane many times, and that when Achane's "mouth's moving, he's lying." When Parris was asked by defense counsel whether others involved in the case had lied to him in the past, Parris said that appellant, Latimer, Bell, and Porsche were liars, but that Mo and George were not.

and photo was found near the Altima; appellant's fingerprints were found in the Altima on the driver's side back door.

Parris went to an address in Eureka to arrest appellant on January 10, 2001, but appellant was not there. Shortly after Parris returned to the police station that day he received a phone call from appellant. Part of the conversation was taped and the tape was played for the jury at trial. Appellant told Parris that he had been in Pittsburgh, California on the night of the incidents. Parris urged appellant to turn himself in, but appellant hung up the phone and did not surrender. Appellant was apprehended in Richmond, California on January 24, 2001; he did not have any identification when he was arrested, and told the officer that his name was Michael Lawson, Junior.

At trial, none of appellant's friends identified him as the assailant. Latimer said that he did not see appellant at the club or at Denny's. Achane, as has been noted, said appellant went to the club but not to Denny's. Bell said he went with appellant, Achane, and Latimer to the club, but he had a lot to drink at the club and could not remember what happened after it closed. Porsche told Parris that appellant had been angry and "acting stupid" at Denny's. At trial, Porsche did not remember seeing appellant at Denny's. He said he lied to Parris, and told him what he wanted to hear. Petra saw appellant at the club, but not at Denny's. Prudhomme saw appellant at Denny's, but did not remember seeing him in the parking lot. George heard shots at Denny's, but did not see anyone there with a gun. Vainuku and Mo gave statements incriminating appellant, but at trial could not remember anything that happened at Denny's. The prosecutor dubbed it "the case of the fortuitously forgetful friends."

Parris was questioned at some length about the procedures he used with the photo lineups. He said that it was his practice not to put suspects together in the same lineup. He would create a separate lineup for each suspect, grouped with people with similar features who the witnesses did not know. Parris did not prepare photo lineups for Achane or Porsche because he did not regard them as suspects. The lineups for appellant and Latimer consisted of prior booking photos. Parris knew that his photo of Lattimer was an old photo, but he thought it was a "good likeness" and said he did the best he could with

7

what he had to work with that night. "I was in a position at that time at the early morning hours," Parris explained, "to use what I had in front of me. When I was going to be able to get back with these kids was unknown. I knew many of them lived out of town. I had a lineup that was given to me that I probably wasn't completely happy with. But I had to make use with what I had. And, of course, I didn't have another photo of Tyvonne to put into a lineup. So I used what I had and showed it."[4]

Latimer's hair was not in cornrows when Parris took his picture two days after the incidents. Parris did not, "for fear of confusion," show a new lineup with the more recent photo of Latimer to anyone who had viewed the prior lineups. "If I show them the second lineup," Parris said, "there's always that possibility that they may direct their attention towards the individual because now they're seeing a second photo in a second lineup of . . . the same individual I've had earlier. So it can . . . taint that identification." At trial, Parris was shown a Department of Motor Vehicles photo of Latimer in cornrows taken two weeks before the incident. Parris admitted that Latimer "actually look[ed] a little bit like" appellant in that photo, but he did not consider it a good picture of Latimer, and could not have used it on the night of the incidents because DMV photos take several days to obtain.

Parris questioned Petra, Moore, Morgan, Hair, Bady, Matthews, Ephriam, and Hudson, in that order, at the police station that night. Parris did not show the lineups to Petra because they had not been completed before her interview concluded. Parris showed Moore, who identified Latimer as the assailant, lineup two (with Latimer) first,

---

[4] As has been indicated, an identification card with Latimer's photo was recovered at the scene. It is unclear whether that photo was more current than the one used in the lineup or whether it could have been incorporated into the lineup; nothing was made of those matters at trial. The witnesses who "lived out of town" were apparently the HSU-student victims (e.g., Ephriam and Moore were from Los Angeles, Bady was from Vacaville); appellant and his friends were evidently locals (Parris said that he was familiar with all the potential suspects, and that Vainuku and Mo had grown up with appellant; Mo called appellant a "neighborhood kid"; Achane's mother said that the "whole clan"—appellant, Latimer, Bell, Porsche, and Mo—were like sons to her, etc).

and lineup one (with appellant) second. The others—who, aside from Hair, all identified appellant as the assailant—were shown lineup one (with appellant) first, and lineup two (with Latimer) second. When Parris was asked whether Moore was the only one shown Latimer's lineup first, he answered, "That could be. Actually, it never came to my attention. But now that you mention it, yes, I guess that's true. They [the witnesses other than Moore] might have been shown 1 versus 2 first I—I don't recall. But now that you mention it, yes, that could very well be."

After Vainuku and Mo implicated appellant in the assaults, Parris showed them appellant's lineup to confirm that they were talking about him; Parris did not think it was necessary to show them both lineups because they knew appellant well and had identified him by name. Parris did not conduct a live lineup with appellant after his capture because he was satisfied with the identifications from the photo lineups.

Ephriam, Vainuku, and George said they were testifying only because they had been subpoenaed. When asked whether his testimony made him concerned for his safety, Ephriam said, "You always got to be concerned for your safety, period." Vainuku said that his father had advised him against testifying. When asked if she felt anything unusual when she was going to Denny's on appellant's lap, George replied, "Do I have to answer that question?"

When asked about his reactions to the shots in the parking lot, Latimer remarked, "[T]hings like that don't happen out here. We don't live in the city. So I'm not—I don't got nothin' to be scared of like that."

The evidence was presented in 11 half-day court sessions; the jury deliberated less than three hours before rendering its verdicts.

## II. DISCUSSION

### A. Questions and Comments on Appellant's Failure to Request a Lineup

Appellant contends that the prosecutor committed misconduct in the questioning of Detective Parris and in closing argument by referring to appellant's failure to demand a live lineup. (See *Evans v. Superior Court, supra,* 11 Cal.3d at p. 625 [lineup may be ordered on defense motion].)

9

(1) Record

After Parris was cross-examined on his lineup procedures, the prosecutor asked him, "Now, you are aware, were you not, that prior to the time of the preliminary hearing, the defendant is entitled to demand a live lineup?" When Parris said, "yes," the prosecutor asked whether appellant had made any such demand. Before Parris could answer, defense counsel objected that this questioning "unfairly shifts the burden," and "is akin . . . to a *Doyle* error." (*Doyle v. Ohio* (1976) 426 U.S. 610 [prohibiting use of defendant's post-arrest, post-*Miranda* silence to impeach the defense case].) Counsel moved to strike, and asked for the jury to be admonished "that what the defendant says or does [in his defense] is not admissible." After the jury was excused, counsel reiterated his objection that the questioning was "tantamount to *Doyle* error." The prosecutor argued that the questioning was proper because it concerned appellant's appearance, rather than his testimony, and thus did not involve his right to remain silent. The prosecutor submitted that he could comment on appellant's failure to produce relevant evidence. The objection was overruled, the motion to strike was denied, and there was no further examination on the subject.

The defense maintained in closing argument that Latimer had committed the assaults, and that the identifications of appellant were suspect because the photo lineups were tainted. Defense counsel noted that appellant was the only one in the photos who matched the descriptions of the assailant as someone with braids tied back. (See fns. 1 and 2, *ante*.) He argued that only one lineup, with appellant's photo and a recent photo of Latimer, should have been used. He also observed that the defense did not "need to prove anything."

The prosecutor responded, without objection, that "we know from Detective Parris, you know, that the defendant has a right to a live lineup. Bring the witnesses in, see them in the flesh. You don't have to—there's some concern about the validity of the identification. You have a right to that. No such lineup was ever requested. Parris didn't put one on because Parris was satisfied with the—with the accuracy of the identifications that he had. No need for it. This—this kind of argument where you're saying that

you've got a tainted lineup and all of this is something that could have been cleared up early on and wasn't, that's akin to me—to like the Mendes (sic) brothers who killed their parents and then come into court and say: 'Feel sorry for me because I'm—I'm an orphan.'"

(2) Analysis

Appellant renews his claim that the questioning and argument about his failure to demand a lineup was "akin" to error under *Doyle v. Ohio, supra,* 426 U.S. 610, which prohibits the prosecution from exploiting a defendant's post-*Miranda*-advisement silence. Since *Miranda* warnings implicitly indicate that the defendant's silence will not be used against him, it is unfair to use that silence to impeach the defense at trial. (*People v. Earp* (1999) 20 Cal.4th 826, 856; *People v. Hurd* (1998) 62 Cal.App.4th 1084, 1092.) *Doyle* error can occur either in questioning of witnesses or jury argument. (*People v. Evans* (1994) 25 Cal.App.4th 358, 368.) A single unanswered question may constitute *Doyle* error if the question improperly refers to the defendant's silence and a defense objection to the question is erroneously overruled. (*Id.* at p. 369.)

Appellant also renews the argument that questioning and comment on his failure to request a lineup improperly shifted the burden of proof in the case—an error, he submits, "akin" to that under *Griffin v. California* (1965) 380 U.S. 609, which prohibits the prosecution from exploiting the defendant's failure to testify at trial. (See generally *People v. Brown* (2003) 31 Cal.4th 518, 554 [stating *Griffin* rule]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1338-1340 [rejecting claims of *Griffin* error and impermissible burden shifting]; *People v. Austin* (1994) 23 Cal.App.4th 1596, 1611, disapproved on another point in *People v. Palmer* (2001) 24 Cal.4th 856, 861, 867 [observing that *Doyle* and *Griffin* both involved attempts to take unfair advantage of the defendant's silence].) Appellant cites several basic jury instructions (which were given in this case) in support of this argument. (CALJIC Nos. 2.90 [the defendant is presumed innocent; the prosecution bears the burden of proof]; 2.60 [no inference can be drawn from the defendant's failure to testify]; 2.61 [the defendant may choose to rely on the state of the

evidence in deciding whether to testify; no lack of testimony on the defendant's part
makes up for the People's failure of proof].)

It has long been established that "although *Griffin* prohibits reference to a
defendant's failure to take the stand in his own defense, that rule 'does not extend to
comments on the state of the evidence or on the failure of the defense to introduce
material evidence or to call logical witnesses.' " (*People v. Vargas* (1973) 9 Cal.3d 470,
475; see 5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 575, pp.
822-823 [collecting cases].) Thus, "[a]s a general principle, prosecutors may allude to
the defense's failure to present exculpatory evidence" (*People v. Guzman* (2000) 80
Cal.App.4th 1282, 1289), and such commentary does not ordinarily violate *Griffin* or
erroneously imply that the defendant bears a burden of proof (e.g., *People v. Bradford,
supra,* 15 Cal.4th at pp. 1338-1340; *People v. Ratliff* (1986) 41 Cal.3d 675, 690-691).
*Griffin* and *Doyle*'s protection of the right to remain silent is a "shield," not a "sword"
that can be used to "cut off the prosecution's 'fair response' to the evidence or argument
of the defendant." (*People v. Austin, supra,* 23 Cal.App.4th at p. 1612, quoting *United
States v. Robinson* (1988) 485 U.S. 25, 32.) Questions or argument suggesting that the
defendant did not have a fair opportunity to explain his innocence can open the door to
evidence and comment on his silence. (*People v. Austin, supra,* at pp. 1612-1613.)

Here, alleged deficiencies in the police lineups were a centerpiece of the defense
case. Defense counsel asked numerous questions of Detective Parris seeking to impugn
the procedures he employed with the photo lineups. Counsel argued to the jury that the
two lineups Parris used were inappropriately suggestive, and that witnesses should have
been shown a third lineup with a photo of appellant and a more recent one of Latimer.
The prosecution could properly respond to those criticisms by showing that appellant did
not pursue a potential remedy: he could have requested a live lineup that might have
eliminated his professed concerns. (See *People v. Green* (1979) 95 Cal.App.3d 991,
1004 [defendant concerned with suggestive identification has "readily available remedy"
of demanding pretrial lineup].) Questions and arguments about appellant's ability to
make such a request permissibly referred to his failure to develop exculpatory evidence;

they were not aimed at the exercise of his right to remain silent and were not likely to be understood by the jury as reflecting on that right. (See *People v. Guzman*, *supra*, 80 Cal.App.4th at p. 1289; e.g., *People v. Brown*, *supra*, 31 Cal.4th at p. 554 [comments merely emphasized failure to present material evidence and did not seek to capitalize on the failure to testify]; *People v. Lewis* (2001) 25 Cal.4th 610, 670-671 [remarks did not expressly or impliedly refer to invocation of right to silence and would not have been so understood]; *People v. Morris* (1988) 46 Cal.3d 1, 36, disapproved on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5, 545, fn. 6 [no indirect reference to failure to testify].)

Appellant maintains that there was no right to comment on the failure to produce material evidence or call logical witnesses in this instance because "the logical witness he did not call was *himself*." It may be *Griffin* error to argue to the jury "that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1339.) However, there is no such error when the prosecutor refers to a lack of proof "which might have been presented *in the form of physical evidence* or testimony other than that of defendant." (*Id.* at p. 1340, italics added.) Here, the questions and comments involved appearance in a lineup, a form of "nontestimonial, physical evidence" outside the privilege against self-incrimination protected by *Griffin* and *Doyle*. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1221-1222; *People v. Williams* (1977) 68 Cal.App.3d 36, 45, disapproved on another point in *People v. Bustamante* (1981) 30 Cal.3d 88, 102; *People v. Austin*, *supra*, 23 Cal.App.4th at p. 1611; see also *People v. Preston* (1973) 9 Cal.3d 308, 315 [permitting comment on defendant's "nonassertive conduct prior to trial" if conduct is not an exercise of the Fifth Amendment privilege].) Because lineups do not implicate the right to remain silent, *Griffin* and *Doyle* do not prohibit comment on refusal to participate in a lineup (*People v. Johnson*, *supra*, 3 Cal.4th at pp. 1221-1222) or, in our judgment, on failure to request one. Accordingly, the *Griffin-Doyle* objection was correctly overruled.

Appellant contends that a different conclusion is required under *People v. Lindsey* (1988) 205 Cal.App.3d 112, and *People v. Conover* (1966) 243 Cal.App.2d 38, but those cases are inapposite. In *Lindsey*, the prosecutor committed *Doyle* error by arguing to the jury that defense counsel should have revealed the defendant's alibi defense prior to trial. (*People v. Lindsey, supra,* at pp. 116-117.) As we have explained, no *Doyle* error was committed here. *Conover* held that it was misconduct for the prosecutor to comment on the defendant's failure to call a witness at the preliminary hearing because the defendant's guilt was not at issue in that proceeding. (*People v. Conover, supra,* at p. 49.) Appellant argues that the same kind of misconduct occurred in this case because the questions to Parris concerned the right to demand a lineup "prior to the time of the preliminary hearing." Here, however, the reference to proof prior to the preliminary hearing did not necessarily imply that appellant was obliged to introduce evidence at that hearing; the question merely reflected the usual timing of an *Evans* motion. (See *Evans v. Superior Court, supra,* 11 Cal.3d at p. 626 [motion for a lineup should be made as soon as practicable after arrest or arraignment]; *People v. Burke* (1980) 102 Cal.App.3d 932, 942, fn. 7; Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 6th ed. 2002) § 19.17, p. 484 [defendant must generally decide before the preliminary hearing whether to request a lineup].)

Appellant notes that *Evans* motions are not automatically granted (see *Evans v. Superior Court, supra,* 11 Cal.3d at pp. 625-626 [factors to be weighed in ruling on the motion]), and submits that the questions and arguments about the lineup were improper insofar as they created the erroneous impression that he had an absolute right to a lineup upon request. However, no objections were made on that ground below (Evid. Code, § 353, subd. (a) [waiver of objections to evidence]; *People v. Williams* (1997) 16 Cal.4th 153, 220-221 [waiver of objections to argument]), and even if counsel could be deemed incompetent for neglecting to make such objections, appellant was not prejudiced by those failures (*People v. Fosselman* (1983) 33 Cal.3d 572, 584). It is not reasonably probable that the outcome would have been different if the jury had learned that a defense motion for a lineup could have been denied; the central point—that appellant never even

*tried* to pursue that potential remedy despite his alleged concerns with the police lineups—would have remained.

Appellant argues that the prosecutor also committed misconduct by likening his failure to request a lineup to the Menendez brothers' notorious murders of their parents. (*Menendez v. Superior Court* (1992) 3 Cal.4th 435.)  While the gravity of appellant's omission was hardly comparable to that of the Menendez brothers' acts, the (strained) logic, presumably, was that defendants should not benefit from problems (tainted identifications, having been orphaned) they themselves created (by failing to move for a lineup, by killing their parents).  Prosecutors are permitted to make vigorous, colorful arguments with obvious hyperbole like that used here (see *People v. Williams*, *supra*, 16 Cal.4th at p. 221; *People v. Visciotti* (1992) 2 Cal.4th 1, 81, fn. 44), and there is no reasonable likelihood the jury would have confused appellant's case with that of the Menendez brothers (see *People v. Cunningham* (2001) 25 Cal.4th 926, 1002; *People v. Ochoa* (1998) 19 Cal.4th 353, 427).  Thus, while the comparison seems inapt, it did not rise to the level of misconduct.  Further, because an admonition to ignore the argument would have cured any possible harm, any error as to the argument was waived by the failure to object and request an admonition.  (*People v. Riel* (2000) 22 Cal.4th 1153, 1212-1213; *People v. Wharton* (1991) 53 Cal.3d 522, 566.)  Defense counsel could have reasonably decided to forego the objection to avoid highlighting the argument; thus, contrary to appellant's claim, there was no incompetence of counsel on that score. (*People v. Frye* (1998) 18 Cal.4th 894, 979; *People v. Padilla* (1995) 11 Cal.4th 891, 940, disapproved on another point in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1; *People v. Wharton, supra,* at p. 567.)

B.  Other Alleged Misconduct in Argument[*]

Appellant argues that the prosecutor committed misconduct by disparaging the defense function in his closing arguments.  The prosecutor argued, "An attorney is an advocate.  He is a proponent of one side or the other.  [¶] It is—it is my job, if I can, to

---

[*]  See footnote, *ante*, page 1.

15

convince you that the evidence and reasonable inferences you can draw from that evidence establishes beyond a reasonable doubt that the charge against the defendant is true. [¶] It's [defense counsel's] task or job to get his guy off." Appellant stops the quote there, but the prosecutor continued, "So as you listen to us, keep in mind that we advocates, that we are trying to persuade you of the correctness of our particular position." Defense counsel did not object to these statements, but responded in his closing argument, "I take some offense at the pejorative objective that my job is to get Mr. Lewis off . . . my job is to see that justice is done."

Appellant contends that by describing defense counsel's function as "get[ing] his guy off" the prosecutor improperly implied that counsel would seek to deceive the jury. (See *People v. Cummings* (1993) 4 Cal.4th 1233, 1302.) However, this statement, along with the reminder that the attorneys were advocates, would have been understood by the jury as a warning against the defense interpretation of the evidence, not as a personal attack on defense counsel. (See *People v. Cunningham, supra,* 25 Cal.4th at pp. 1002-1003 [statements that defense counsel's job was to "create straw men" and "put up smoke, red herrings" were not misconduct]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1216, 1217, fn. 13 [claims that lawyers freely interpret the truth "properly served to remind the jury to focus on the relevant evidence and to not be swayed by argument alone"]; *People v. Miller* (1990) 50 Cal.3d 954, 997; *People v. Bell* (1989) 49 Cal.3d 502, 538.)

The prosecutor ventured that there were only "a limited number of defenses," described various defenses like alibi, self-defense, and unconsciousness that did not "apply here," and concluded, "So we come down to the—you know, final I guess SODDI. It's S-O-D-D-I. Some other dude did it." Appellant contends that this argument conveyed an overly cynical view of the defense function by suggesting that "any given defense is always a sham." However, it is unlikely that the jury would have given the remarks that objectionable interpretation. (*People v. Cunningham, supra,* 25 Cal.4th at p. 1002; *People v. Ochoa, supra,* 19 Cal.4th at p. 427.) The prosecutor merely identified a number of defenses that were not being asserted (for whatever rhetorical

16

worth that argument might have) and supplied an acronym for the defense theory. The comments were permissible observations on the defense case.

After the defense argued that Latimer was the perpetrator, the prosecutor said, "Listening to [defense counsel], I can appreciate again his great skill as an advocate, the zealousness with which he approaches his task. [¶] One thing that has kind of run through my mind throughout this proceeding is I'm sure glad that I'm not trying to convict Tyvonne Latimer, because I would have one person who says that he was trying to get out of the driver's side of the door and who identified Tyvonne as his assailant. That is Mr. Moore. [¶] And at this point, I would be faced with all of the other evidence that says that it wasn't Tyvonne Latimer at all who committed this particular offense." The prosecutor then went on to observe that Latimer had no motive for the assaults, and to contrast at length the evidence implicating Latimer and appellant. In appellant's view, the quoted passage "comes perilously close" to an improper profession of personal belief in appellant's guilt. However, the remarks were permissible comments on the strength of the prosecution and defense theories, and on the state of the evidence.

Appellant charges the prosecutor with misconduct for improperly alluding to race in closing arguments. The prosecutor said that a "[n]umber of the witnesses we've had here are young men who have come to this county or who came to this county from large urban areas in the south. And [a] couple of them indicated that they have concerns about their safety." He later added, "It is a tragic fact about our society that people are afraid. They're afraid. There are some places in this state where you can't go. Some places where groups have control and they rely on intimidation and force and threats. Humboldt county isn't like that. But there are places like that in the state. That's why we have statutes dealing with gangs. That's why we have regulations in schools and things."

Appellant argues that these comments "introduced an entirely irrelevant factor for the jury's consideration—the 'differentness' of the witnesses from the jury," and impermissibly "injected a provincial 'us vs. them' attitude" into the case. Although there were no explicit references to race, appellant submits that "the unspoken fact of the witnesses' race lay just under the surface of their 'urban' origins," and notes that the

17

prosecutor had observed in voir dire that African Americans were a "significant minority" in Humboldt County.  Appellant contends that the references to gangs and school rules were also irrelevant, and "merely an appeal to the passions and prejudices of the jury."

The comments at issue were not aimed at appellant because he was apparently from the local area.  (See fn. 4, *ante*; compare *U.S. v. Cannon* (8th Cir. 1996) 88 F.3d 1495, 1502, 1503 [improper "appeal to parochial allegiances" where defendants were not locals].)  The "whole clan" of friends (to use one of their mother's expressions) who were trying to cover up for appellant were also locals.  (Fn. 4, *ante*.)  Fear was expressed by as many witnesses who were locals as by those from out of town.  Thus, whatever else might be said about it, the argument in question made little sense.[5]

In any event, since the argument was not so inflammatory that an admonition to ignore it could not have cured any potential harm, any error as to it was waived by the failure to object and request an admonition below.  (*People v. Riel, supra,* 22 Cal.4th at pp. 1212-1213; *People v. Wharton, supra,* 53 Cal.3d 522, 566.)  Counsel could have thought that the argument was too misplaced to warrant an objection, and cannot be deemed incompetent for failing to make one.  (*People v. Frye, supra,* 18 Cal.4th at p. 979; *People v. Padilla, supra,* 11 Cal.4th at p. 940; *People v. Wharton, supra,* at p. 567.)

---

[5]  Latimer's these-things-don't-happen-here remark was equally anomalous in the context of the cross-examination where it occurred, when he was asked why he did not notice who fired the shots at Denny's.  Latimer said that after he heard the shots he checked to make sure that Achane and Bell were okay.  "Q.  Then what did you do?  [¶] A.  We just stood there.  There was nothin' to do.  The police was comin'.  [¶] Q.  You weren't at all concerned about who in the parking lot might have a gun and—and who might have fired those two shots?  [¶] A.  Nope.  [¶] Q.  Why not?  [¶] A.  'Cause things like that don't happen out here.  We don't live in the city.  So I'm not——I don't got nothin' to be scared of like that.  [¶] Q.  But something like that had just happened?  [¶] A.  Yeah.  [¶] Q.  But you—you weren't concerned about who might have fired those shots?  [¶] A.  Concerned?  What do you mean 'concerned'?  Like you wanted me to look around and be nosy?  I'm not gonna look around and be nosy so I can get shot.  I'm not worried about—I'm gonna go about my motherfuckin' business."

Even if counsel should have objected, it is not reasonably probable that the verdicts could have turned on these remarks. (*People v. Fosselman, supra,* 33 Cal.3d at p. 584.)

C. *Wheeler* Ruling[*]

Appellant contends that the court erroneously denied his *Wheeler* motion after the prosecution exercised a peremptory challenge against a prospective African-American juror. Peremptory challenges may not be used to strike prospective jurors on the basis of group bias. (*People v. Wheeler, supra,* 22 Cal.3d at pp. 276-277; *Batson v. Kentucky* (1986) 476 U.S. 79, 89.) A party claiming improper use of peremptory challenges has the initial burden of establishing a prima facie case of purposeful discrimination. (*People v. Williams* (1997) 16 Cal.4th 635, 663-664.) "[T]o state a prima facie case, the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias." (*People v. Johnson* (2003) 30 Cal.4th 1302, 1318, cert. granted *sub. nom. Johnson v. California* (2003) ___ U.S. ____ [124 S.Ct. 817].) If the defendant establishes a prima facie case, the burden shifts to the prosecution to provide a neutral, unbiased explanation for the challenge. (See generally *id.* at pp. 1310, 1312, quoting *People v. Wheeler, supra,* 22 Cal.3d at pp. 281-282 and *Batson v. Kentucky, supra,* 476 U.S. at pp. 97-98.)

Because judges' personal observations are involved in deciding *Wheeler* motions, such rulings are reviewed with considerable deference. (*People v. Johnson, supra,* 30 Cal.4th at p. 1325; *People v. Crittenden* (1994) 9 Cal.4th 83, 117.) We must affirm if the record suggests reasonable grounds for the peremptory challenge. (*Ibid.*) "[E]ven a 'trivial' reason" for the challenge "if genuine and neutral, will suffice." (*People v. Arias* (1996) 13 Cal.4th 92, 136; e.g., *People v. Turner* (1994) 8 Cal.4th 137, 165, 170-171 [hostile body language]; *People v. Johnson* (1989) 47 Cal.3d 1194, 1217-1218.) The issue on appeal is one of substantial evidence (*People v. Alvarez* (1996) 14 Cal.4th 155, 196-197), and only "one legitimate race-neutral explanation" is required to sustain a finding that a challenge was permissible (*People v. Williams, supra,* 16 Cal.4th at p. 666).

---

[*] See footnote, *ante,* page 1.

The juror here, S. G., indicated that a brother and cousin had been convicted of criminal offenses. She did not know her brother's offense, but said that he had failed to meet with his probation officer. She said that she had graduated from HSU with a major in forestry, and had worked seasonally in the Forest Service for 10 years as a file and forest technician. She had worked part time as a security guard at College of the Redwoods, and was currently a direct care worker in a nursing home. She had some law enforcement training at the Forest Service and College of the Redwoods. She was trained to write citations in areas she patrolled for the Forest Service, and wrote tickets at College of the Redwoods. The training was "really just the basics like, um, how to maintain your appearance, your stance, . . . who in the hierarchy, who would you call on if the situation would rise to something out of my hands." Her work had not led to involvement in a criminal case; a confrontation she had with someone while working at the Forest Service was resolved without any charges being brought. She described herself as "unbiased" and "open minded." When asked by defense counsel whether she thought she would be a good juror, she said, "Yes. I know I would."

The first of the six peremptory challenges the prosecutor used was against S. G. The defense brought a *Wheeler* motion, indicating that S. G. was the only African-American "in the entire venire," and arguing that she had "expressed no reservations about her ability to be fair. She's got experience, family related experience with the criminal justice system. She's worked in a, sounds like, a quasi law enforcement capacity and had some basic law enforcement training. She's well educated." Defense counsel could "think of no reason why a peremptory challenge ought to be granted."

The prosecutor acknowledged that S. G. was the only African-American on the panel of prospective jurors, but observed that African-Americans were a "significant minority" in Humboldt County. In view of that scarcity, he said that when he decided "early on in this proceeding" to excuse S. G., he anticipated having to respond to a *Wheeler* motion. Thus, while his belief that S. G. would not be a fair and impartial juror was "a gut reaction more than anything else," he had written "a whole bunch" of notes to explain his reasons for the challenge.

The prosecutor noted that S. G.'s brother and cousin had been convicted of crimes, and "found [it] highly unusual" that she was unaware of the charges against the brother. He admitted that the potential jurors were not "excited about the voir dire process," but noticed that S. G. had her arms crossed before any questions were asked and "appeared to be especially bored." He saw that S. G. sat apart from the rest of the jurors during a break; that behavior and the confrontation she reported having at the Forest Service made him worried that she would not get along with the other jurors. He found S. G.'s claim to law enforcement training "somewhat self-inflating," and suspected that she had been fired from the Forest Service because she no longer worked there despite having a forestry degree. He thought that defense counsel had a rapport with S. G. and that she was "overly impressed" with defense counsel; he worried that he might "have offended [S. G.] in some fashion." He pointed out that many prosecution witnesses, as well as appellant, were African-Americans.

Defense counsel replied that he had not observed anything suggesting that S. G. would be unfit to serve on the jury. Counsel thought much of what the prosecutor said was "sheer speculation"; S. G., for example, might have left the Forest Service voluntarily and not been fired. Counsel submitted that S. G. was attentive, honest, and articulate in voir dire. It was "transparent" to him that the prosecutor did not want an African-American juror in a case against an African-American defendant.

The court ruled that the defense had not made a prima facie case that S. G. was excused because of her race, and that the prosecutor had in any event given valid neutral reasons for the challenge. The court found the defense reasoning on the matter "conclusory," and thought it not at all unusual that the prosecution would want to remove someone, regardless of race, whose brother was having problems on probation. The court also observed that it did not find the prosecutor's voir dire of S. G. "in any way disproportionate to the other people. He didn't have it already set up."

On the foregoing record, even assuming that a prima facie case of discrimination had been established, the prosecution met the burden of showing that the challenge was not predicated on group bias. S. G.'s family member's negative experiences with law

enforcement were a well-recognized valid ground for the peremptory challenge. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1123-1124; *People v. Turner, supra,* 8 Cal.4th at p. 171.) The prosecutor also made various observations and judgments of S. G.— she was not forthcoming about the charges against her brother, she was bored by the proceedings, aloof from other jurors, and enamored of defense counsel—that constituted reasonable, race-neutral grounds for challenging her. (*People v. Reynoso* (2003) 31 Cal.4th 903, 917 [well settled that challenge may be based on counsel's personal observations].)

Accordingly, the court did not err in denying the *Wheeler* motion.

Appellant contends that the challenge to S. G. should be evaluated by comparing her situation to those of others who were allowed to remain on the jury. He cites, for example, jurors who reported negative experiences with law enforcement but were not challenged. Our Supreme Court has cautioned against undertaking comparative juror analysis for the first time on appeal, and we decline to do so here. (*People v. Johnson, supra,* 30 Cal.4th at p. 1325; see *People v. Johnson, supra,* 47 Cal.3d at p. 1221 [difficult to compare treatment of jurors who appear on paper to have been substantially similar].) Appellant has not in any event identified any comparison that would change the outcome given the range of personal observations the prosecutor made about S. G.

D. Lesser Included Offense Instruction[*]

Appellant contends that the jury should have been instructed on brandishing of a firearm (Pen. Code, § 417) as a lesser included offense of assault with a firearm. This contention is inconsistent with a host of decisions by Courts of Appeal holding that brandishing is a lesser related, not a lesser included, offense of assault with a firearm. (*People v. Steele* (2000) 83 Cal.App.4th 212, 218 [citing cases].) Appellant nonetheless maintains that a contrary conclusion is required by *People v. Wilson* (1967) 66 Cal.2d 749, 764 and *People v. Coffey* (1967) 67 Cal.2d 204. This argument is untenable for the reasons stated in *People v. Steele, supra,* at pp. 219-221.

---

[*] See footnote, *ante,* page 1.

## III. CONCLUSION

The judgment is affirmed.

_____

Kay, P.J.

We concur:

_____

Reardon, J.

_____

Sepulveda, J.

*People v. Lewis*, A098387

Trial Court:                              Humboldt County Superior Court

Trial Judge:                             Honorable Marilyn B. Miles

Counsel for Defendant and Appellant:      Renée E. Torres, under appointment
                                          by the Court of Appeal

Counsel for Plaintiff and Respondent:     Bill Lockyer, Attorney General
                                          of the State of California

                                          Robert R. Anderson
                                          Chief Assistant Attorney General

                                          Gerald A. Engler
                                          Senior Assistant Attorney General

                                          Seth K. Schalit
                                          Supervising Deputy Attorney General

                                          Aileen Bunney
                                          Deputy Attorney General

**APPENDIX B**

Court of Appeal, First Appellate District, Division Four - No. A098387
**S124676**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

MILTON LEWIS, Defendant and Appellant.

Petition for review DENIED.

RECEIVED

JUL 0 1 2004

First District
APPELLATE Project

SUPREME COURT
**FILED**

JUN 3 0 2004

Frederick K. Ohlrich Clerk

_____
DEPUTY

_____
GEORGE,
Chief Justice

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**APPENDIX C**

LnB/s

Court of Appeal, First Appellate District, Div. 4 - No. A120646
**S161374**

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re MILTON LEWIS on Habeas Corpus

The petition for review is denied.

RECEIVED

APR 1 0 2008

FIRST DISTRICT APPE...

SUPREME COURT
**FILED**

APR - 9 2008

Frederick K. Ohlrich Clerk

Deputy

GEORGE
Chief Justice

## DECLARATION OF SERVICE

Case Name: MILTON LEWIS, JR., v. ROBERT HOREL, Warden,

Pelican Bay State Prison,;

On _April 30_, 2008, I served a true copy of the attached PETITION

FOR WRIT OF HABEAS CORPUS on each of the following, by placing the

same in an envelope addressed as follows:

Jerry Brown
Attorney General
455 Golden Gate Blvd., Suite 11000
San Francisco, CA 94102-3664

Each envelope was then sealed and deposited in the regular out-going

inmate mail at Pelican Bay State Prison in Crescent City, California, with the

postage thereon fully prepaid.

I declare under penalty of perjury of the laws of the State of California that

the foregoing is true and correct.  Executed on _April 30_, 2008, at

Crescent City, California.

MILTON LEWIS, JR.,

Milton Lewis Jr. T-49765
P.B.S.P.
A8-120
P.O. Box 7500
Crescent City, CA. 95532-7500

RECEIVED

MAY 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

PELICAN BAY
G.P.UNIT A-8

To:

**FIRST DISTRICT APPELLATE PROJECT**
730 Harrison Street, Suite 201
San Francisco, California 94107

Clerk of the United States District Court
for the Northern District of California
450 Golden Gate Ave.
Box 36060
San Francisco, CA 94102

